VILLAGE OF AURORA AND INDEPENDENT SCHOOL
DISTRICT NO. 40, ST. LOUIS COUNTY, v. COM-
MISSIONER OF TAXATION.
OLIVER IRON MINING COMPANY, LAKE SUPERIOR CON-
SOLIDATED IRON MINES, AND ST. JAMES MINING
COMPANY, RELATORS.[1]

March 31, 1944.

Nos. 33,548, 33,549.

[1]Reported in 14 N. W. (2d) 292.

*Elmer F. Blu* and *Clarence J. Hartley,* for relators Oliver Iron Mining Company and Lake Superior Consolidated Iron Mines.

*Gillette, Nye, Harries & Montague,* for relator St. James Mining Company.

*Patrick J. Ryan* and *Fred A. Cina,* for respondents Village of Aurora and Independent School District No. 40.

*J. A. A. Burnquist,* Attorney General, and *P. F. Sherman,* Assistant Attorney General, for respondent Commissioner of Taxation.

YOUNGDAHL, JUSTICE.

*Certiorari* upon the relation of Oliver Iron Mining Company, Lake Superior Consolidated Iron Mines, and St. James Mining Company to review separate decisions of the board of tax appeals increasing the assessed valuations for tax purposes as of May 1, 1940, of certain mineral properties.

Pursuant to statute, the commissioner of taxation, hereinafter referred to as the commissioner, functioning as the board of equalization to consider the equalization of certain iron ore properties, was requested to make a revaluation thereof for the purpose of lowering the assessment. Hearings were held on October 28, 1940, and December 16, 1940. Pursuant to notice thereof given by the commissioner, the respondents, Village of Aurora and Independent School District No. 40, St. Louis county, hereinafter referred to as the municipalities, appeared as interested parties.

On December 19, 1940, the commissioner determined that the assessed valuation of a certain leasehold interest known as the Burt Land Mine and located in the assessment district of the town of Balkan, St. Louis county, held by the Oliver Iron Mining Company and Lake Superior Consolidated Iron Mines, was $153,356. He simultaneously fixed at $161,441 the assessed valuation of certain property owned in fee by the St. James Mining Company, located in the assessment district of the village of Aurora. The

commissioner's determination reduced the valuations at which the two properties had been previously assessed.

Contending that the assessments were inadequate, the municipalities, on February 7, 1941, appealed to the board of tax appeals, hereinafter referred to as the board, from the commissioner's determination. Pursuant to § 278.01 (§ 2126-1), an action was commenced within 10 days in the district court of St. Louis county by the mining companies, hereinafter referred to as taxpayers, in which the assessments were claimed to be excessive. This action is now pending and undetermined.

The issues involved in the two appeals to the board were substantially identical insofar as taxpayers were concerned, and the actions were consolidated for hearing.

Prior to the hearing on appeal, taxpayers moved for a stay of proceedings before the board while the district court action was pending. This motion was denied. Thereafter and at the commencement of the hearing on appeal, taxpayers made an alternative motion to stay proceedings or dismiss the appeal upon grounds hereinafter discussed. The board denied this motion in its entirety and proceeded to hear the appeal *de novo* pursuant to § 271.06, subd. 6 (§ 2362-15[f]). Findings of fact were made by the board and separate decisions rendered increasing the assessed valuation of the Burt Land Mine to $184,154 and that of the St. James Mine to $200,132. Taxpayers are before this court by *certiorari*.

Since the issues involved here as to the two taxpayers are for the most part identical, all matters herein will be considered as applicable to both parties, unless specifically distinguished. In addition to the contention that the board erred in raising the valuation of the properties, the assignments of error raise certain procedural and jurisdictional questions going to the authority of the board to hear the appeal.

█ Taxpayers contend that the notices of appeal did not raise the issue that the assessed value of the property was greater than the amount determined by the commissioner's order of December 19, 1940; that they contain only allegations of error as to certain

factors used by the commissioner in computing the valuation thereof. They assert: "A formula is nothing but a mental path followed by the Commissioner in reaching the valuation. It is the final result, the valuation, that counts—not the course followed in reaching it."

What shall be included in a notice of appeal to the board is governed by § 271.06, subd. 2 (§ 2362-15[b]), which provides in part as follows:

"* * *  The notice of appeal shall refer to the order appealed from, state specifically the points of both law and fact which are questioned by the appellant, * * *. Every appellant shall be deemed to have waived all defenses and objections not specified in the notice of appeal."

The municipalities' respective notices of appeal specifically state that the appeals are from that "order and decision dated December 19, 1940, equalizing and fixing the assessed valuation of the following described property, included in said order." Then follow particular references to certain factors used by the commissioner in arriving at his conclusion, which the municipalities contend are erroneous. The last assignment of error in each notice, except for a difference in figures on the value of the mines, is as follows:

"In determining the total value of said property he arrived at a computed full and true value of * * * and an assessed value of * * *.

"He should have determined that the total full and true value thereof was at least the sum of * * *, and that the assessed value thereof was at least the sum of * * * which valuation would have resulted and will result from a computation of value upon the plan and method employed by him, if modified as hereinbefore set forth, * * *."

Taxpayers contend that this claim of error does not adequately raise the issue of undervaluation. We believe this to be too narrow and strained an interpretation of the notices of appeal, and that it is without merit. The quoted claim of error, in our opinion, un-

mistakably sets forth that the issue involved is the undervaluation of the properties. The jurisdiction of the board was not defeated by the specification of error as to certain factors used in the computation. The most that can be said is that the statement as to the factors is mere surplusage.

The primary purpose of a notice of appeal is to apprise opposing parties of what issues will be litigated upon appeal. In considering the sufficiency of a notice of appeal, this court stated in In re Estate of Devenney, 192 Minn. 265, 268, 256 N. W. 104, 105:

"\* \* \* By a more discriminate selection of words a better notice might have been drafted. But, in the final analysis, this court is not dealing with niceties. \* \* \* We do not believe that this court should look with favor upon objections which reach only the form of the notice and not its substance. This notice should be liberally construed as pleadings in general are liberally construed by this court. The notice is sufficient. See In re Estate of Parcker, 183 Minn. 191, 192, 236 N. W. 206; First Unitarian Society v. Houliston, 96 Minn. 342, 343, 105 N. W. 66, where similarly worded notices were held sufficient."

This is in accord with the general rule stated in 4 C. J. S., Appeal and Error, § 593, as follows:

"\* \* \* Notices of appeal, however, should be liberally construed, and as a rule the notice is sufficient if it reasonably shows that an appeal is intended and the judgment, order, or decree appealed from substantially states the other facts required by the statute to be shown; the notice will not be rendered insufficient by mere clerical errors or other defects which could not have misled, or *by mere surplusage.*" (Italics supplied.)

See also Roddy v. Gazette Co. 163 Iowa 416, 144 N. W. 1009; Morrison and Skaug v. Connery, 54 S. D. 329, 223 N. W. 210; Johnson v. California-Washington Timber Co. 159 Wash. 214, 292 P. 418; Haydel v. Morton, 3 Cal. App. (2d) 364, 39 P. (2d) 454; 1 Dunnell, Dig. & Supp. §§ 319, 323.

There was only one final order of the commissioner fixing the valuations involved herein. The appeal clearly specified that it was being taken from that order. The record indicates that taxpayers were fully aware of the issue to be litigated and that no prejudice resulted from the language employed in the notice of appeal. We conclude that the notice was sufficient to raise the issue of inadequate valuation of the properties.

■ The municipalities joined in both appeals to the board. Error is claimed by taxpayers because the board refused to dismiss the appeal for misjoinder of parties. The Burt Land Mine is located in the assessment district of Independent School District No. 40 but not within the village of Aurora. The St. James Mine is located in the assessment district of the village but not within Independent School District No. 40. Taxpayers base their argument upon the provisions of § 270.19 (§ 2372-1). This section, which is the same as § 1 of L. 1931, c. 304, provides in part that when any taxpayer or property owner has applied for the reduction of the assessed valuation of any real or personal property in an amount exceeding $15,000, it shall be the duty of the commissioner to give written notice to the officials of the municipality *wherein such property is located*, and to permit such municipality to have reasonable opportunity to be heard thereon. Taxpayers contend, therefore, that, insofar as the specific property involved is not within the confines of a municipality, the latter is an improper party on appeal. Taxpayers erroneously assume that the municipalities' right to appeal is governed by the 1931 act. As hereinafter discussed in paragraph 4 of this opinion, such right to appeal is not controlled by the 1931 act, but by § 271.06, subd. 1 (§ 2362-15[a]), which is the same as § 15(a) of art. 6 of L. 1939, c. 431. This section provides:

"Except as otherwise provided by law, an appeal to the board may be taken, in the manner herein provided, from any official order of the commissioner of taxation respecting any tax, fee, or assessment, or any matter pertaining thereto, by any * * * *polit-*

*ical subdivision of the state, directly or indirectly, interested therein or affected thereby, * * *."* (Italics supplied.)

Since the two properties are in the same county and in close proximity to each other, it is extremely probable that a decision affecting one property would indirectly, if not directly, affect a nearby municipality, and the board properly refused to dismiss the appeals for misjoinder of parties.

■ Taxpayers urge that their motion to dismiss the appeal before the board should have been granted because the municipalities have not complied with § 270.20 (§ 2372-2), which is the same as § 2 of the 1931 act, by requesting an additional hearing before the commissioner upon the equalization and assessment of the properties involved herein; and, further, that the appeal was from an *intermediate* and not a *final order* of the commissioner.

Section 270.19 (§ 2372-1), which is the same as § 1 of the 1931 act, provides in part as follows:

"* * * It shall be the duty of the commissioner of taxation, when any taxpayer or property owner has applied for a reduction of the assessed valuation of any real or personal property in an amount exceeding $15,000, to give written notice to the officials of the municipality wherein such property is located and to permit such municipality to have reasonable opportunity to be heard at any proceedings concerning such application."

In the instant case, taxpayers applied for a reduction of the assessed valuation of the properties involved herein in an amount exceeding $15,000, and the commissioner gave notice to the municipalities of such application. Pursuant to the notice so received, the municipalities appeared as interested parties at the hearings held by the commissioner on October 28, 1940, and December 16, 1940. After such hearings, the commissioner made his findings of fact and order reducing the assessed valuations of both the Burt Land Mine and the St. James Mine.

Taxpayers complain because the municipalities did not file a written request for an additional hearing under § 270.20 (§ 2372-2), which in part provides:

"Any such municipality may, at any time within ten days after * * * the filing with the auditor of such county of any order of the commissioner of taxation reducing the assessed valuation of any property in such municipality, file a written request with the commissioner of taxation for a hearing upon the equalization or assessment of any property within such municipality, * * *. The commissioner of taxation shall thereupon order a hearing thereon and mail a notice stating the time and place of such hearing to the municipality and to the owner of such property."

Taxpayers take the position that any appeal afforded the municipalities will lie only from an order of the commissioner made as a result of the hearings held under § 270.20; that all the powers possessed by the commissioner insofar as summoning witnesses, keeping official records, and his fact-finding powers, are predicated upon a final order contemplated by § 270.20.

We believe that such an interpretation of §§ 270.19 and 270.20 would lead to an absurd result. It would require a municipality which has been a party to proceedings and represented at hearings held by the commissioner for the purpose of reducing the assessed valuation of property culminating in a final order therein to again request an additional hearing within ten days after the filing of such an order on the same subject matter and between the same parties and heard by the same officer. It is unreasonable to suppose that the statute contemplated a second hearing, which would only mean a repetition of the same evidence and arguments. In either case, when the municipality has had its "day in court," the resulting order of the commissioner is a final one so far as any proceedings before the commissioner are concerned. Although the municipalities in the instant case offered no evidence before the commissioner, they appeared twice pursuant to notices of the commissioner that the valuations of the properties were to be considered and determined, and they participated in the arguments. A con-

struction of a statute which results in an absurdity is to be avoided. 6 Dunnell, Dig. & Supp. § 8947, and cases cited. It appears more reasonable to us, and we so conclude, that the legislature intended § 270.20 to afford municipalities who, for any reason, had not appeared at any former hearing, an opportunity to make a request for a hearing after the filing of the commissioner's order reducing such assessed valuations; or, at most, that it is a provision granting municipalities the *privilege* of requesting a hearing—a privilege to be exercised at the discretion of such municipalities. Section 271.06, subd. 1 (§ 2362-15[a]), which is a part of the so-called reorganization act (L. 1939, c. 431), provides that "an appeal to the board may be taken * * * from any official order of the commissioner of taxation." The appeals taken by the municipalities were from an "official order" of the commissioner within the contemplation of § 271.06, subd. 1, and taxpayers' motion to dismiss because the appeals were not taken from a *final order* was therefore properly denied.

■ Taxpayers further contend that if any appeal is proper it would lie directly to the supreme court under §§ 270.22, 270.23 (§§ 2372-4 to 2372-6), which are the same as §§ 4, 5, and 6 of L. 1931, c. 304, rather than to the board, under the provisions of § 271.06 (§ 2362-15), which is the same as § 15 of art. 6 of L. 1939, c. 431. This makes it necessary for us to consider here the 1939 enactment, which reorganized the department of taxation as it then existed and created the board of tax appeals. Consideration must be given to the comprehensiveness of the act, the purposes for which the board was created, the qualifications of its members, and its general functions. The board, consisting of three members appointed by the governor by and with the advice and consent of the senate, is created as an "independent agency of the executive branch of the government, in the Department of Taxation, but not in any way subject to the supervision or control of the Commissioner of Taxation." § 271.01. The act emphasizes with particularity the qualifications of the members thereof, in that "they shall be selected on the basis of their experience with and knowledge of taxation and tax

laws," and "they shall be nonpartisan in their political affiliations." Thus the legislature with extreme care provided for the establishment of an independent board of experts which would be nonpolitical in its functions and impartial between the state, its political subdivisions, and the taxpayer, subject to a final review of its acts by the courts. It restricted the activities of its members so as to guarantee, as far as possible, an open-minded, unbiased membership, experienced in tax matters, and uninfluenced by any consideration other than the determination of issues upon the evidence submitted. The issues before the board are tried *de novo*.

The instant case provides a good example of the need for this salutary type of legislation. A vast amount of technical engineering data and mathematical computations calling for experience and specialized learning in tax matters was submitted to the board for its consideration. The reorganization act of 1939 is in harmony with the modern trend of creating an intermediate board to serve as a so-called administrative "clearinghouse" between a department of government and the courts. The creation of the federal board of tax appeals is an example. A review lies from that board (now the Tax Court) to the circuit court of appeals. 26 USCA, c. 5, § 1141. The purpose of creating that board, as expressed in the federal decisions, is consistent with the purposes herein expressed for the creation of the state board of tax appeals under the 1939 act. In Warren Mfg. Co. v. Tait (D. C.) 60 F. (2d) 982, 984, the court in discussing this identical point said:

"The history of, and the primary objects sought to be obtained by the creation of, the Board of Tax Appeals must be understood. The Board was created in 1924. One of its principal objects was to relieve the taxpayer of the hardship of paying a deficiency assessment before contesting the same, which was necessary prior to that time. But also it was intended to relieve the federal courts of the great burden of tax litigation to which they exclusively fell heir, by transferring it to a new agency, which, by its specialized work, would be an expert body better fitted than a court of general jurisdiction to hear and decide tax questions."

In considering what the intention of congress was in creating the federal board, the circuit court in Avery v. Commr. of Int. Rev. (5 Cir.) 22 F. (2d) 6, 7, 55 A. L. R. 1277, said:

"It was undoubtedly the intention of Congress to create an independent *board of experts* to decide impartially between the government and the taxpayer, with the right to a final determination of the questions presented in a regularly constituted court before payment of the tax. *It is consistent with that intention to say that it was not contemplated that the Courts of Appeals should be burdened with reviewing the mass of evidence usually submitted before a board charged with the duty of considering technical details.*" (Italics supplied.)

We are of the opinion that the creation of the board by the 1939 act was effected for these same salutary purposes. Whatever inconsistencies existed between L. 1931, c. 304, and the reorganization act of 1939 were eliminated by L. 1939, c. 431, art. 8, § 14, which provides:

"All other acts or parts of acts now in effect inconsistent with the provisions of this act are hereby repealed, superseded, modified, or amended so far as necessary to conform to and give full force and effect to the provisions of this act."

It has been suggested that the phrase "Except as otherwise provided by law" in § 271.06, subd. 2 (§ 2362-15[b]) was intended to preserve the specific appellate procedure provided for by the 1931 act. We believe that the clear and unambiguous language of § 271.06, subd. 1 (§ 2362-15[a]), giving any political subdivision the right of appeal if directly or indirectly interested or affected, negatives such a construction. We have often stated that words cannot be separated from their context and, by a process of etymological dissection, an attempt made to ascertain the intention of the legislature. The several provisions of the law must be construed together and the act considered as a whole to ascertain its true intent. Mattson v. Flynn, 216 Minn. 354, 13 N. W. (2d) 11; Merritt v. Stuve, 215 Minn. 44, 9 N. W. (2d) 329. To give the statute

the construction claimed by taxpayers would be to thwart the plain purpose of the legislature in establishing a special tribunal for the settlement of tax disputes. We therefore hold that the municipalities had a right to appeal to the board under the 1939 act, and the motion to dismiss the appeal on the ground that it should have been taken directly to this court under the 1931 act was properly denied.

■ A motion by taxpayers to stay proceedings before the board pending determination of the action brought in the district court was denied. They complain that this was error, since § 271.09, subd. 3 (§ 2362-18[c]) provides in part as follows:

"In any case where, at the time of the taking of an appeal to the board by any person or agency other than the taxpayer, the taxpayer has an existing right of action in the district court for the determination of any issue or issues determinable upon the appeal, such right of action shall be barred, * * * unless within ten days after the service of the notice of appeal upon him the taxpayer shall commence an action for the determination of such issue or issues in the proper district court."

Taxpayer then, *inter alia,* is required to give the necessary bond, pay the prescribed portion of the tax, and give proper notice of the commencement of the action. It is undisputed that taxpayers here have met these requirements.

Section 271.09, subd. 3, further provides:

"* * * Thereupon further proceedings upon the appeal shall be stayed with respect *to the issue or issues* involved in the action until final determination of the action; provided, that this *shall not stay the appeal as to any other issues."* (Italics supplied.)

Taxpayers vigorously contend that the only issue involved in each proceeding is: What was the value of the properties as of May 1, 1940? The municipalities, with equal vigor, emphasize the fact that the issue in the district court was one of overvaluation of the properties, while the issue before the board was one of undervaluation. In this connection it is necessary to examine §§ 278.01 to 278.13

(§§ 2126-1 to 2126-13), under which taxpayers' right to maintain an action was created. These sections are the same as L. 1935, c. 300. Section 278.01 reads in part as follows:

"Any person having any estate * * * upon any parcel of land, who claims that such property has been partially, unfairly, or unequally assessed, or that such parcel has been assessed at a valuation greater than its real or actual value, * * * may have the validity of his claim * * * determined by the district court of the county in which the tax is levied."

Section 278.05, on the trial of the issues, provides in part:

"Such petition, without any answer, return, or other pleading thereto, shall stand for trial at any general term in session when the same is filed."

In cases of this nature the commissioner has fixed an assessment figure which he claims represents the value of the property for tax purposes. The taxpayer claims it is excessive. As between these two interested parties, a "ceiling" has been placed upon the value, and the court is restricted to a consideration of the issue whether the commissioner's assessment should be sustained or lowered. The procedure under L. 1935, c. 300, does not authorize a judgment for a value greater than the assessment. Section 278.07 provides for a judgment (1) if the tax is sustained in the full amount; (2) if the tax so determined is less than the amount levied; and (3) if there is no judgment for taxes. See State v. Oliver I. Min. Co. 198 Minn. 385, 270 N. W. 609. The board, on the other hand, tries such matters de novo. It has the power under § 270.22 to raise or lower the assessed valuation set by the commissioner if such power is properly invoked. In the instant case, the municipalities appealed to the board on the ground of inadequate assessment, thereby raising the issue of undervaluation. The taxpayers did not take a cross-appeal to raise the question of excessive valuation. The municipalities offered evidence tending to prove that the assessment was inadequate. The taxpayers contended the assessment should be affirmed. Thus, in the proceedings before the board a

"bottom" figure for assessment had been set, below which the board could not go in arriving at a valuation, and the board was therefore restricted to a consideration of the issue whether the valuation should be increased.

The following discussion, which took place at the close of the taking of testimony before the board and the statements of counsel, indicates clearly that the issue before the board was restricted to that of determining whether the valuation should be increased.

"Mr. Sherman: * * * I understand that *the only issue* before the board is whether the figures are too low. If there is any other claim I think it ought to be cleared up now.

"Mr. Montague: No one claims, so far as I know, that the board has power to lower them * * *.

* * * * *

"Mr. Hartley: * * * I don't claim that the board in this proceeding can increase the value—or I mean can decrease the value, but I haven't changed my position any from the position I presented on the motion to stay that the determination of the issue on the appeal includes determination of the question of value. * * *

* * * * *

"Mr. Sherman: I take it it is clear that no one claims now in this stage in the proceedings that the board has jurisdiction to lower the valuation of these two mines. If that is correct then the appellee has no testimony to offer other than returns which he filed."

It seems too clear for argument that the issue before the board was thus restricted to the sole question whether the valuation should be increased. In the district court proceeding the court has no power to raise the valuation. It follows, therefore, that a different issue was involved there.

Our attention has been called to this language in State v. Oliver I. Min. Co. 198 Minn. 387, 270 N. W. 610, *supra,* decided in 1936: "The sole issue was the value of these several mines as of May 1, 1932." That action was brought for the purpose of enforcing pay-

ment of delinquent taxes. The taxpayers there urged the defense of excessive valuation. The reorganization act had not been passed, and the court was not considering the precise question here involved as to identity of issues. That the issue there was clearly restricted to one of "overvaluation" is indicated by the following language of the court in that case (198 Minn. 409, 270 N. W. 621):

"* * * The language of the statute is plain, i. e., relief is to be had when the property has been taxed 'at a valuation greater than its real and actual value.'

"* * * The *overvaluation* here is substantial and cannot be governed by the *de minimis* rule. The findings established that there was obviously 'a valuation greater than its real and actual value.' In consequence, a reduction 'in all instances of *overvaluation*' should follow. * * * To the extent of the *overvaluation* involved as to these two mines the order should be corrected." (Italics supplied.)

It will thus be seen that in that case the issue was clearly defined to be one of *overvaluation*, while in this case, before the board, the issue was as clearly defined as one of *undervaluation*. In legal terminology the word "issue" has several meanings and senses. 33 C. J., Issue, § 1; Laney v. Rochester Ry. Co. 81 Hun (N. Y.) 346, 30 N. Y. S. 893; Niagara F. Ins. Co. v. Scammon, 35 Ill. App. 582. In order to determine the intention of the legislature, it becomes necessary at times to expand or restrict the ordinary and usual meaning of words, phrases, or clauses found in a particular section or statute. Board of Education v. Bryner, 57 Utah 78, 192 P. 627. Here, in order to arrive at its real meaning, the use of the word "issue" in the statute must be considered in connection with the context. 6 Dunnell, Dig. & Supp. § 8968; 59 C. J., Statutes, § 577, and cases cited. If we should accept taxpayers' construction of § 271.09, subd. 3 (§ 2362-18[c]), the municipalities would be foreclosed from raising the issue of undervaluation. Surely such was not the intention of the legislature. It is clear to us that it was intended by the 1939 act to give the municipalities a full opportunity to have the issue of undervaluation considered by the

board of tax appeals, and that taxpayers, if they so desired, could, by a cross-appeal, have any claim of overassessment determined. The board correctly, therefore, denied the motion to stay the proceedings.

■ The basis and authority for taxation of mining properties are §§ 273.11 and 273.12 (§§ 1992, 1992-1), which provide in part as follows:

"273.11 [§ 1992]. All property shall be assessed at its true and full value in money. * * * In valuing real property upon which there is a mine or quarry, it shall be valued at such price as such property, including the mine or quarry, would sell for at a fair, voluntary sale, for cash. * * *

"273.12 [§ 1992-1]. It shall be the duty of every assessor and board, in determining the value of lands * * *, to consider and give due weight to every element and factor affecting the market value thereof, * * *."

It is further provided by § 273.13, subd. 2 (§ 1993, Class 1), that, for the purposes of taxation, "Iron ore, whether mined or unmined, shall constitute class one and shall be valued and assessed at 50 per cent of its full and true value."

Thus it will be seen that the statute defines the basis of assessment of mining property to be the sale or market value of each of these mines at the time of assessment at a "fair, voluntary sale, for cash." Except for two isolated sales, the situation in the instant case is the same as in the Oliver company case of 1936, so far as a foundation upon which the valuation of the mining properties can adequately be made. In our opinion, these sales were not sufficiently representative to justify a valuation of the mines in question solely upon that basis. If there are insufficient sales to establish a market price, values may be determined by the judgment and opinion of men "acquainted with the lands, their adaptability for use, and the circumstances of the surrounding community." State v. Oliver I. Min. Co. 198 Minn. 395, 270 N. W. 614, *supra;* State ex rel. City of South St. Paul v. McNiven, 183 Minn. 539, 237 N. W.

410; In re Delinquent Real Estate Taxes, 182 Minn. 543, 235 N. W. 22.

In the case at bar, as in the 1936 case, the experts giving their opinion as to value were guided by the use of a "commercial appraisal method" of determining future profits from unmined ore, and by the application of the so-called Hoskold formula in the reduction of such future profits to their present worth. In determining the future net profits from the mining and marketing of the ore, certain cost factors are estimated, and these estimates give rise to differences of opinion, presenting issues of fact. Also, in the application of the interest rates implicit in the Hoskold formula, there is a divergence of opinion presenting questions of fact. Although the parties agree that the method of calculating costs and the Hoskold formula present a competent and probably the only available guide at the present time in determining the present worth of mines in Minnesota, they dispute the use of certain factors in the calculation of costs and the "hazard" rate of interest used in the Hoskold formula. Reference is made to the Oliver case, 198 Minn. at pp. 396, 397, and 398, 270 N. W. pp. 615 and 616, as to form of computation followed in the instant case. The issues have been exhaustively and ably briefed and argued by both sides. Many factors are involved in the computation of costs and the application of the Hoskold tables. A detailed discussion of all of them would unduly prolong this opinion, which already occupies considerable space because of the many procedural and jurisdictional questions involved, but we shall devote such discussion to the individual factors as we deem necessary.

Under § 271.10 (§ 2362-19), a review of a final order of the board of tax appeals may be had upon *certiorari* by the supreme court, and such review is limited to a consideration of the questions whether the board was without jurisdiction, that the order of the board was not justified by the evidence or was not in conformity with law, or that the board committed any other error of law. The board, with one member dissenting, filed its findings of fact and conclusions of law, together with a comprehensive memorandum

fully setting forth the basis of its conclusions. In the consideration of these fact questions evolving from a computation of the cost factors and the application of the Hoskold formula, our responsibility is limited under the statute to the question whether the evidence reasonably sustains the findings of the board. In reviewing an order or determination of an administrative board, the court will go no further than to determine whether the evidence was such that it might reasonably make the order or determination in question. State v. Oliver I. Min. Co. *supra;* State ex rel. Inter-State Iron Co. v. Armson, 166 Minn. 230, 207 N. W. 727; Chellson v. State Div. of Emp. & Sec. 214 Minn. 332, 8 N. W. (2d) 42; Bowman v. Troy Launderers & Cleaners, Inc. 215 Minn. 226, 9 N. W. (2d) 506.

■ We give consideration to the following factors in calculating net future profits and the application of the interest rates in the Hoskold formula, which taxpayers claim were erroneously used and applied, to determine whether there is reasonable evidence to sustain the findings of the board.

### (a) LAKE ERIE PRICE

In the computation employed by the commissioner and approved by the board, there was used as a selling price per ton for ore a figure commonly referred to as the "Lake Erie Price." This price is established by the first chance sale of ore of prescribed iron content in the spring at lower lake ports. Up to the present time, at least, this price has been accepted by competing steel industries as a measure of iron ore value. The same method in determining the price was approved in the 1936 case. Since the assessment date here under consideration was May 1, 1940, the computation was made of the average Lake Erie price for the five-year period immediately prior thereto, namely, 1935 to 1939. This method of taking the five-year average was approved in the 1936 case.

The Lake Erie price has been the subject of considerable controversy in mining valuations. For many years the tax commission used it as the basis for determining the price of ore. In the 1936

case, taxpayers relied upon the Lake Erie price as a recognized standard of value. The state in that case protested the use of the Lake Erie price as an artificial one and unfair to the municipalities. The lower court upheld taxpayers' contention as to the Lake Erie price. In defending the Lake Erie price before this court in that case, taxpayers in their brief, although asserting that the price should be lower because a large quantity of ore had been sold at a price under the Lake Erie price, said this:

"The defendants' contention is that the Lake Erie price is a bona fide price, that it fully reflects the value of iron ore in the making of steel."

In the 1936 case, this court sustained the use of the Lake Erie price as a basis for computation. Upon the appeal in the instant case, however, taxpayers object to the use of the Lake Erie price in the calculation of costs. They contend that the price is too high, and they offer proof of isolated sales in 1940 and 1941 for which the price was 40 to 50 cents lower per ton than the Lake Erie price as of May 1, 1940. It is true, the record does not show that any sales were made in excess of that price. Neither does it indicate what percentage of the total tonnage shipped by taxpayers was at a figure lower than the average price computed by the commissioner and approved by the board. From the record, we are unable to say with any reasonable degree of certainty whether it was a substantial portion of the gross shipments. In the 1936 case, the lower court in its memorandum had this to say concerning the Lake Erie price:

"* * * There is not a word of evidence in the record that any Mesaba Range ore, during any of these years, has been sold above the Lake Erie price; and *some ore has been sold below it.*" (Italics supplied.)

Thus it will appear that the Lake Erie price was sustained in the earlier case although ore had been sold below the price and none had been sold above it. That is the situation now. In the absence of a more substantial showing than that made by taxpayers, the

board was justified in adopting the Lake Erie price as a basis of calculation. Whether the future will warrant the use and application of this more or less arbitrary and fixed price as a guide in such computation we cannot now determine. It is sufficient to say that upon the record before us the evidence reasonably sustains its use in this case.

### (b)  Shrinkage

In arriving at the Lake Erie price of $4.31 per ton for ore, the board took into consideration the fact that certain loss or shrinkage occurs in the weight of the ore between shipment and unloading. An allowance of 2.2 cents per ton, the equivalent of one-half of one percent, was made. Taxpayers contend that the universal practice is to make settlement upon vessel bill of lading weights, one percent under railroad weights, so that the seller, instead of receiving pay for the weight of ore shipped, is paid on a basis of 99 percent thereof. Taxpayers' witnesses concede that actually the loss might not exceed one-half of one percent. If conditions in fact do not exist warranting a one percent deduction, we believe the board was justified in allowing only that percentage of loss which actually occurred.

### (c)  Range Life

It is necessary to calculate the range life in order to determine the present worth of mining properties for tax purposes. In the instant case the commissioner used a range life of 38 years. This figure was approved by the board. The commissioner arrived at the range life by dividing the entire reserve tonnage of ore on the Mesaba Range as of May 1, 1940, less some 80 million tons which the commissioner believed was "wash ore" and not strictly competitive, by the average annual shipments for the years 1935 to 1939. Included in the annual shipments and constituting about 20 percent of the total was certain beneficiated ore. Had the deduction of the wash ore from the reserve tonnage and the addition of the beneficiated ore to the annual shipments not been made, the range life

would have been approximately 41 years, which taxpayers contend is more nearly correct and would result in a lower valuation.

In the 1936 case, a range life of 38 years was used and approved by this court. Whatever figure is selected, it is arbitrary. The effect of calculating range life is to give equal distribution of the values of the tonnage to the whole range. No one actually believes that the entire Mesaba Range will be exhausted in either 38 or 41 years; but such unit of measure, although arbitrary, has been used as a factor by both the taxing authorities and private industry for computation purposes.

The board found there was sufficient reason, due to the quality of the ore excluded from the total tonnage, to justify the commissioner's deduction therefrom. Taxpayers offered no evidence to the contrary. Since the general formula is approved by the parties and range life is an essential factor therein in order to arrive at present worth, we are not in a position to substitute our judgment, assuming a desire to do so, for that of the board, which, in our opinion, is justified by the record.

### (d)  AD VALOREM TAX

In his computation of assessed valuation, the commissioner allowed a deduction of 11 cents per ton as an estimate of future *ad valorem* taxes to be paid over the operating life of the property, and a deduction of 1.6 cents per ton as an estimate of *ad valorem* taxes, on an inactive basis, for a three-year deferment period, with compound interest at six percent. The 11-cent figure was approved by the board, and the inactive tax for the three-year deferment period was also approved, but the interest rate was reduced from six percent to five percent. It appears that, at the hearing before the commissioner, taxpayers raised no question as to the amount of this deduction, but did raise the question for the first time before the board. Taxpayers contend that the 11-cent figure is too low and that there should be an allowance of at least 23½ cents per ton. The formula used by the commissioner and approved by the board is based upon the assumption that no *ad valorem* taxes will

be paid, except an inactive tax, during a three-year deferment period while the property is being put into physical condition for operation, and a further tax over the operating life of the property, which in the case of the Burt Land Mine is 20 years. The formula further assumes that the ore will be mined and shipped in even annual installments and that taxes would decrease in proportion to the decreases in value of the property as the ore would be taken from the mines. The commissioner arrived at the *ad valorem* tax of 11 cents per ton to be paid during the operating life of the mine by a mathematical formula first adopted and urged by taxpayers in the 1936 case. The tax for the three-year deferment period with interest at six percent was calculated separately at the inactive tax rate. Taxpayers criticize the computation because the commissioner used a too short period of deferment, failed to take into account probable periods of idleness during the operating life of a mine, and assumed that taxes would decrease in a straight line as the ore was mined and shipped. On the matter of the *ad valorem* tax the record is not very satisfactory. It may be conceded that a finding that 23½ cents per ton was a proper allowance might have been made. The fixing of the values and the determination of the allowances, however, are not committed to us. That is the board's responsibility as the trier of fact.

Taxpayers urge that the municipalities' expert, Downing, although adopting the 11-cent figure, admitted that the 23½-cent per ton allowance would be more nearly correct. Downing did not explain the method he would use in arriving at the 23½-cent figure. In the final analysis, he did adopt the 11-cent allowance, because he stated that he did not want to deviate "from the method used by the court."

The expert testimony as to the basis for the 23½-cent allowance is based upon many uncertain and variable factors, and there necessarily is a great deal of speculation as one endeavors in these days of global conflict to look into the future. In the 1936 case, the same computation as used here in arriving at the *ad valorem* tax was set up and proposed by taxpayers as a fair method to deter-

mine the tax rate. The lower court in that case, though conclud-
ing that another type of computation would more adequately reflect
the tax allowance that should be made, approved its use. This
court, without discussion, also sustained the *ad valorem* calculation.
Now, taxpayers insist that their method of computation in the
1936 case was wrong, that a longer deferment period should be
included, an allowance made for periods of idleness, and that it is
improper to consider that taxes decrease in a straight line.

It is to be borne in mind that in determining the deferment
period for the *ad valorem* tax a period was decided upon that would
be as nearly uniform and fair to all the mines as possible. The wit-
ness Baxter testified:

"Q. You would think there might be some hazard as to whether
you would only have in the aggregate a three years' inactive tax
period, a three-year period on which you would have to pay taxes
that the mine wasn't operating?

"A. Yes. I would like to say as to that though, you set up, of
course, you did, in the case tried in '34 they tried to set up a scheme
that would be fair to all the properties on the range. * * * The
scheme that was set up was an arbitrary method of trying to arrive
at uniformity, at a fair valuation, so that we would not be over-
valuing the properties as a whole, a division of the value of the
ore into the individual properties."

Taxpayers contend that during the operating period of the mine
the taxes would not necessarily diminish in a straight line. Their
witness Bergstrom testified as follows:

"Q. As the ore went down, instead of the tax coming down pro-
portionately the mill rate would increase or might increase?

"A. That's correct. However, I don't want to give the impres-
sion that a mine can ship ore and the taxes gradually go up. That
could be—might be true, but it hasn't been my experience that it is.
Taxes go down, but not along the line of a straight line reduction."

In the computation submitted by taxpayers and sustained by the
court in the earlier case, their theory at that time was that the

taxes would diminish uniformly over the operating period so that at the end of production there would be no tax at all.

Entering into this calculation are many speculative factors, one of which is the deferment period of three years used by the commissioner. It is entirely conjectural when any individual property will come into production. It is conceivable that certain mines might be ready for production in less than that period, while others might be idle past the three-year deferment period. The exact time when any given property can be brought into production cannot be known in advance, nor can the rate of production from it be definitely forecast. Production may begin at any time within the range life. The designation of a three-year period is arbitrary, but at least it can be justified by the fact that it is uniformly applied to the entire range. Whether the operating life of a mine will be one of consistent and even production is also highly speculative. Similarly, the length of operating life cannot be foretold with absolute certainty. What exigencies may intervene in that interim to change the course of production are completely unpredictable. Periods of idleness in operation may be anticipated but may not necessarily come to pass. At best, the reasonable expectation as to the future of a mine is a matter of engineering judgment. The millage rate also is difficult to prognosticate. Taxpayers urge that it is likely to increase. It may be as strongly urged that it may be reduced. Since the entire method of computation and calculation in determining the profits to be earned from the mining of ore and in reducing such profits to their present worth is based upon so many uncertainties, the testimony of the witnesses qualified to pass judgment upon these matters necessarily abounds in reservations and conditions. Their conclusions must be drawn not only from past experience, but also from a consideration of future economic changes. The determination of the probative force to be given expert testimony is for the trier of fact. Sheffield King Milling Co. v. C. G. W. R. Co. 168 Minn. 402, 210 N. W. 282; 2 Dunnell, Dig. & Supp. § 3334. This court is inclined to defer to the judgment of the trier of fact as to the weight to be attached to the testimony

of expert witnesses. Carlson v. C. G. W. R. Co. 114 Minn. 382, 131 N. W. 375. In the final analysis, it was for the board to exercise its own judgment, in view of all the circumstances disclosed in the testimony, as to how the ultimate issue should be decided. On this point the board, after hearing the testimony, concluded:

"Since a great deal of the evidence presented to the Board on this point, as well as most of the others, was based on opinions of various witnesses and the opinions based on numerous assumptions, we do not feel that the figure adopted by the Commissioner should be altered. It is based on the method approved by the Court in the one case which is precedent for valuing iron ore properties in Minnesota, the Oliver case."

The fact that the board approved the method of computation as to *ad valorem* tax or any other factors involved in the computation in the 1936 case does not necessarily mean that it is to stand the test of time. Each case of valuation before the court is to be determined according to the conditions existing at that time. The method of computation and the formula used are not invariable or sacred. As we said in the 1936 case, it is merely a guide to assist the trier of fact in the determination of the issue before it. Until some better method is suggested for determining the valuation of mines, it is proper that it should be used for such purpose. We believe it was for the board to determine, from the entire record before it, whether circumstances had sufficiently changed since the 1936 case to justify a new method of computation in the determination of the *ad valorem* tax. In our opinion, the board was justified in concluding that, because taxpayers themselves previously submitted the formula as a sound principle for the determination of the *ad valorem* tax, there was not sufficient justification, from a consideration of all the evidence, to change it now. The deference to be given to the conclusions reached by an administrative agency is expressed in the recent case of Dobson v. Commr. of Int. Rev. 320 U. S. 489, 501, 64 S. Ct. 239, 247, filed December 20, 1943 (rehearing denied February 14, 1944, 64 S. Ct. 495), where the court,

referring to the decisions of the Tax Court (formerly Board of Tax Appeals), said:

"* * * Whatever latitude exists in resolving questions such as those of proper accounting, treating a series of transactions as one for tax purposes, or treating apparently separate ones as single in their tax consequences, exists in the Tax Court and not in the regular courts; when the court cannot separate the elements of a decision so as to identify a clear-cut mistake of law, the decision of the Tax Court must stand."

We believe, however, that if the taxing authorities continue to use such a method of calculation as a guide to assist them in arriving at mine valuations, reconsideration should be given to the *ad valorem* computation in order to arrive at a more satisfactory formula.

### (e) INTEREST RATES

The board reduced the interest yield to taxpayers from six percent, as calculated by the commissioner, to five percent on (1) funds employed in building the plant, developing the mine, and working capital; (2) taxes to be paid during the three-year deferment period before the property presumably comes into operation; (3) capital invested during the three-year deferment period. The basis of the conclusions reached by the board was that "The testimony shows conclusively that interest rates were lower in the money market on January 1, 1940, than they were on January 1, 1932. * * * From all the testimony we find that five percent is representative of this rate and represents a liberal allowance."

The testimony of witnesses familiar with the market placed the ordinary rate of interest from four to six percent on a reasonably safe investment. There is ample evidence to support the board's conclusion of five percent interest on these items.

### (f) HOSKOLD FORMULA

The board's reduction of the Hoskold formula hazard or discount rate from seven percent to six percent is claimed as error by taxpayers. This rate has been variously referred to as the income,

speculative, hazard, and discount rate, but, for convenience, it will be hereinafter designated as the discount rate. After the quantity and quality of ore in the ground are determined, as well as the price at which it will sell when mined, the cost of mining and marketing, and the life of the mine, the future profits from the operations are determined, and the Hoskold tables are applied to reduce these profits to their present worth. An income to be received over the next 40 years has obviously a present worth of considerably less than such income received immediately. Long-time interest rates and hazards of investment determine how much less this value should be. These are the rates implicit in the Hoskold formula.

The basic theory underlying the use of the Hoskold formula is that mining property is a wasting asset, and at the end of the mining operations nothing remains of the investor's capital. Because of this, the formula assumes that as the ore is mined the income of each year must be considered partly as a return of capital and partly as a profit on the venture. Provision is therefore made in the application of the formula for the investment of the returns from the mine in a sinking fund at a safe and conservative rate of interest so that the operator will be reimbursed his capital investment at the end of the mining period. The formula assumes further that there will be equal annual returns over the range life of the mine. The hazard or risk of the investor in not having his capital returned at such times and in such amounts as is contemplated is reflected in the use of the discount rate. The discount rate that is applied should be high enough to attract an investor away from the so-called "safe securities" or "bankers' investments" into a new venture, and to cover such unpredictable hazards as cannot be reflected in the various factors used, such as general hazards of business and the hazard that the capital will not be returned in the amount and at the times assumed in the computation.

The commissioner determined the discount rate to be seven percent and the safe rate four percent. The board changed these rates to six percent and three percent respectively. Although lowering the safe rate to three percent had the effect of lowering the valu-

ations, the municipalities conceded it to be a proper rate on the appeal to the board. The dispute therefore centers around the reduction of the discount rate. Upon conflicting testimony in the 1936 case, rates of seven percent and four percent were sustained in the application of the formula.

In this case, both sides relied upon the opinions of expert witnesses in support of their respective theories as to a proper discount rate. The witnesses produced by the municipalities testified to rates ranging from the low of the short-term federal government loans of less than one percent to a top of six percent for investments in general business enterprises involving some hazard. The rates according to taxpayers' witnesses range from a low of two percent for safe investments to a high of 10 percent for mining operations. The board had this to say in justification of its conclusion as to a six percent discount rate (Record, pp. 131-132, folios 393-396):

"In arriving at the rate of interest to be applied for the high or speculative rate, considerable divergence of opinion existed among all parties concerned. Witnesses for the Taxpayers contended this rate should be from 8 percent to 10 percent. These witnesses were mining engineers with considerable experience in valuing mining properties. Appellants' witnesses, one of whom was a mining engineer, were of the opinion that this rate should not exceed 5 percent.

"The Taxpayers contend that the reason why a higher rate of interest is justified than that used by the Commissioner, is because of the risk involved. It is contended that only in this speculative interest rate in the Hoskold formula, are the specific hazards of mining reflected. Without going into detailed discussion of these hazards, suffice it to say that they consist of such things as future raises in taxes, unknown difficulties in mining that might be encountered when actual operations are started such as water hazards and rock hazards, periods of depression, competition with ore bodies located elsewhere, and several others including the prob-

ability that actual operations will not be started within the three-year deferment period.

"Mr. Baxter, Appellants' witness, concedes that this 5 percent rate is a bankers' loan rate without reflecting the element of risk. In the Oliver case the Court considered that 1 percent should be added to the rate to cover the risks and hazards. The Board, after considering the evidence feels that 5 percent would be too low an interest rate to use as the high rate in the Hoskold formula. It feels that the general hazards and risks should be reflected in this rate and adds 1 percent for this reason and adopts 6 percent as the high rate in this formula."

It is well known that a safe security such as a government bond will sell at par even though the rate be low. Other types of investment must offer a larger rate of interest. Although we do not overlook the fact that transactions in securities of various kinds result in hazards not exactly comparable to the hazards resulting from a mining venture, yet we believe they were proper to be considered by the trier of fact in determining what the ultimate discount rate should be in the instant case. What men are currently able to get in the way of return in long-term investments is relevant, in our opinion, in determining the basis on which mining property will change hands between a willing buyer and seller. Taxpayers lay considerable stress on the unusual hazards of the mining industry. In their brief they assert that the investor in an iron mine "must see his investment through to the finish, * * * he cannot even remodel his property or convert it to a different use if the proposed use proves unprofitable, like an investor in ordinary improved real estate." In the uncertainty of a future aggravated by war and postwar activity, there is scarcely a business or venture that does not entail considerable hazard. Basic industries, such as manufacturing and others, involve hazards from which mining is entirely free. Although there are no doubt particular hazards incident to the mining industry that are not present elsewhere, it was for the board to determine, upon the evidence before it, what rate was sufficient to cover such hazards. Numerous cost factors can

be determined, we believe, with as reasonable certainty in the mining industry as in many other types of business ventures. The anticipated hazards of increasing costs of labor, taxes, and related items are common to any business. The going rate of return at which money is invested in an enterprise involving some hazards, or the so-called bankers' rate, we believe reflects the possibility of increased costs. It has been suggested that certain factors used in the computation might prove more adverse than now anticipated. We quite agree. But it might with equal force be asserted that results more favorable may also ensue. This much is conceded in one of taxpayers' briefs, wherein it is stated:

"It is obvious that one factor may be conservative, another factor may be liberal, and the entire result must be looked at to see whether it is deemed to reflect the true value."

Upon conflicting testimony in the 1936 case, rates of seven percent and four percent were sustained by the district court and this court. There was evidence in that case also indicating a proper discount rate up to 10 percent. The earlier case was tried in the depth of the depression. The record clearly indicates, and it is fortified by common knowledge, that conditions have radically changed since that case was tried as far as interest rates are concerned. Especially is this true in the investment field, whether in investment securities or business enterprise. It is not likely that returns will increase in the immediate future. No one knows the extent of the war or the influence and effect of postwar activity on industry. For discussion of downward trend of interest rates in recent years, see Akron, Canton & Youngstown Ry. Co. v. Hagenbuch (6 Cir.) 128 F. (2d) 932; Federal Power Comm. v. Natural Gas Pipeline Co. 315 U. S. 575, 62 S. Ct. 736, 86 L. ed. 1037; Hope Natural Gas Co. v. Federal Power Comm. (4 Cir.) 134 F. (2d) 287.

The testimony of the municipalities, disputed by some of taxpayers' witnesses, indicated that interest rates on low-rate safe securities and rates on speculative investments rise and fall together, though there are periods when this will not be true. Tax-

payers concede that the low rate has gone down, but contend that this tends to increase the hazard rate. The conflict of the testimony in this regard presented a fact question for the board to determine. We well recognize the fact that with the exception of witness Baxter, who would not give an opinion on the discount rate as to the St. James Mine, the witnesses for the municipalities had no mining experience and their opinions related principally to the so-called "bankers' rate of interest." On the other hand, the witnesses for taxpayers had extensive mining experience and were no doubt more familiar with the hazards involved in that particular industry. But, important to be kept constantly in mind in such a case as this is that the jurisdiction of this court with reference to fact questions under the statute creating the board of tax appeals is appellate. We cannot substitute our judgment for that of the board. It is the trier of fact, and it determines the probative value of such testimony. That is *its* prerogative and not *ours*. Sitting in review, our jurisdiction upon fact questions is limited to the determination of whether there is reasonable evidence to sustain the findings. There is nothing to indicate that the board did not give due consideration to the fact that the witnesses for taxpayers had the additional mining experience and background heretofore mentioned. We believe that the testimony of witnesses for the municipalities was competent and proper to be considered, together with all the other evidence in the case, in the determination of the discount rate.

This issue has given us considerable difficulty. We concede that the findings might have been the other way. Testimony of some of the experts is not as satisfactory as it should be. It is apparent from the memorandum of the board attached to its findings that it carefully considered the case and gave the testimony of the expert witnesses thorough consideration. From a careful consideration of the entire record, we cannot say as a matter of law that the board was not justified in changing the discount rate from seven to six percent, and we conclude that there was evidence reasonably tending to sustain the board's finding on that issue.

### St. James Mining Company

This taxpayer complains of the commissioner's estimate of 3,900,000 tons of ore in the ground, in that the figure included 875,000 tons of paint rock ore, which, in its opinion, is not merchantable. The gross tonnage set by the commissioner is taken from the estimate made by the School of Mines of the University of Minnesota, and is identical therewith. In the 1936 case, the reserve tonnage of this mine was estimated at 3,535,231. It appears that this strata of paint rock ore overlies the merchantable ore and will have to be removed before access can be had to the main body of minerals. An allowance for this condition has been made in the commissioner's estimate of mining costs. In the earlier case, mining costs were approved at $1.25 per ton. This figure has been raised by the commissioner to $1.40 per ton. This increase allows 10 cents per ton for increased cost of labor and supplies and five cents per ton for the particular hazard in this mine. Similarly, an allowance of .064 cents per ton was allowed for future development and .102 per ton for plant expenditures, whereas in 1936 the allowances were .059 for development and .045 for plant. Because of these increased allowances for the St. James Mine, we come to the conclusion that the board was justified in determining that consideration had been given to whatever peculiar conditions existed insofar as that property was concerned. Downing testified in answer to the question:

"Q. Did you take that into consideration when you included these mining costs in this mine, the removal of the paint rock?

"A. All of those things were considered.

"Q. You arrived at this figure when you took into consideration all of those things?

"A. Yes."

While taxpayer objects to the inclusion of the 875,000 tons of paint rock, it does not definitely state that this represents a total loss, nor what percentage of it could be considered as a loss. Witness Bergstrom testified that it was an "undesirable" grade of ore

and "frequently" caved in and was left in the mine in underground operations. In his computation the commissioner used an analysis figure of 45.1 representing the natural iron content of this ore. This figure was not questioned by taxpayer. Since it is obviously uncertain what value there might be to taxpayer in this particular grade of ore, and inasmuch as the commissioner has given consideration to this problem in his estimate of mining costs, we are of the opinion that the board was justified in accepting the commissioner's figure on gross tonnage.

Argument is made that there were a number of other mining properties considered by the commissioner in conjunction with the two involved in this appeal; that the commissioner applied a uniform and equal method of valuation to all the properties under consideration; and that the action of the board in changing several of the factors insofar as the Burt Land Mine and the St. James Mine are concerned resulted in discrimination and unequal assessments. The record is not before us in relation to the assessments of the other mines. We are restricted to a consideration in the cases properly here as to whether the evidence reasonably justifies the board's findings.

The municipalities have discussed the factors of price of marketing and the propriety of the deduction of federal income taxes. Inasmuch as there is an affirmance here and the municipalities did not take a cross-appeal, it becomes unnecessary to consider these claimed errors.

In the discussion of the various factors used in the computation of costs and the application of the Hoskold tables, we are impressed with the great amount of uncertainty and speculation that underlies the method of calculation. We fully appreciate the possibility of error and miscalculation. But the question is whether the overall picture has been fairly reflected in the factors employed and the interest rates applied. We quite agree with the statement in the Oliver brief: "It is obvious that overliberalism in one factor may be offset by overconservatism in another, and the accuracy of the final result will depend upon whether, on the whole, the factors

used fairly reflect what may be anticipated in the future." In the final analysis, it was for the board to use its independent judgment, based on all the testimony, in determining the issue of undervaluation, since, as expressed in Dobson v. Commr. of Int. Rev. 320 U. S. 489, 501, 64 S. Ct. 245, 246, 88 L. ed. —, *supra,* with reference to the functions of the Tax Court:

"* * * It deals with a subject that is highly specialized and so complex as to be the despair of judges. It is relatively better staffed for its task than is the judiciary. Its members not infrequently bring to their task long legislative or administrative experience in their subject. The volume of tax matters flowing through the Tax Court keeps its members abreast of changing statutes, regulations, and Bureau practices, informed as to the background of controversies and aware of the impact of their decisions on both Treasury and taxpayer. * * *

\* \* \* \* \*

"* * * However, all that we have said of the finality of administrative determination in other fields is applicable to determinations of the Tax Court. Its decision, of course, must have 'warrant in the record' and a reasonable basis in the law. But 'the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' "

See also B. & O. R. Co. v. Commr. of Int. Rev. (4 Cir.) 78 F. (2d) 460; Federal Power Comm. v. Hope Natural Gas Co. 320 U. S. 591, 64 S. Ct. 281, 88 L. ed. —.

We conclude that the evidence reasonably sustains the findings of the board and that the writs should be discharged.

Writs discharged.

MR. JUSTICE MAGNEY took no part in the consideration or decision of this case.