VILLAGE OF BURNSVILLE v. COMMISSIONER
OF TAXATION.

202 N. W. 2d 653.

November 17, 1972—No. 43479.

Grannis & Grannis and Vance B. Grannis, for relator.

Comaford, Fassett, Clarkson & Lewis and David W. Lewis, for respondent power company.

Warren Spannaus, Attorney General, and David D. McMillan, Special Assistant Attorney General, for respondent commissioner.

PER CURIAM.

Relator, Village of Burnsville, by writ of certiorari, challenges the Minnesota Tax Court's finding of the fair market value of a 1,420-acre tract of land owned by respondent-taxpayer, Northern States Power Company. The assessment of taxes is as of January 2, 1968. Taxpayer, a public service corporation engaged in the business of generating and distributing electric energy to the general public, has its Black Dog Generating Plant located on a portion of the tract, but the value of the plant structures and improvements is not involved in these tax proceedings.

Taxpayer's land is located in the bottomlands of the Minnesota River, generally bounded on the north by the river, on the south by tracks of the Chicago & North Western Railway Company, on the east by Cedar Avenue, and on the west by Interstate Highway No. 35W. Approximately 560 acres of the land consist of Black Dog Lake, a long, narrow slough with an average normal depth of about 2 feet, the plant structures and improvements are on 52 acres, and the remaining acreage is unimproved, raw land.

The tract is zoned for heavy industrial uses, but its utility for such purposes is limited by its low elevation and poor soil conditions. Be-

cause of its low elevation and proximity to the river, the entire tract is subject to periodic flooding and was flooded seven times in the period 1951 to 1969. To mitigate the hazard to the plant structures, those areas were raised from 10 to 20 feet with fill material. The worst of the floods occurred in 1965, when the river elevation rose 15.35 feet above flood stage, flooding the land to depths of 14 feet. Continuous pumping was necessary to maintain the plant's substation in operation, and the only access to the plant was by boat.

The soil and subsoil throughout the tract consist of soft, silty materials that will not support the weight of substantial structures without the use of pilings to depths of from 40 to 55 feet. Construction of the 500-foot by 500-foot powerhouse, the largest structure, required the driving of more than 5,000 pilings, and another 2,000 or more pilings were required in the construction of the smaller outlying structures.

Location of the tract on the Minnesota River does have two favorable aspects. The first is that the river, the channel of which was dredged and straightened by the Army Corps of Engineers, is utilized by barges for the economical transport of coal and other bulk materials used by taxpayer. The second is that proximity to the river permits the economical use of large quantities of water in taxpayer's power generating processes. Black Dog Lake is connected to the Minnesota River by an improved natural outlet at one end and by an artificial inlet at the other end, upon which control gates were constructed by taxpayer. Water is introduced from the river into the plant. The intake water is used in the process of condensing steam from the steam turbine generators and the heated water is discharged into the slough for cooling before return to the river. This use of the slough permits taxpayer to comply with state thermal pollution control standards during prescribed warm months of the year without any necessity for constructing cooling towers.

The assessor for the village of Burnsville placed a market value on the entire tract of land, exclusive of the stated structures and improvements, of $2,525,000, to which he added a so-called "use increment" of $3,965,000 (later reduced by him to $1,343,000) because of taxpayer's use of Black Dog Lake for cooling water in lieu of constructing cooling towers.[1] Taxpayer, on the other hand, contended that the fair market value of the land was not more than $710,000.

---

[1] Prior to the January 2, 1968, assessment, the assessor had treated the 560 acres of Black Dog Lake as valueless wasteland. The tract was valued at $963,840 in the prior 1966 assessment.

The commissioner of taxation, by order, thereafter determined that the market value of the land was $2,525,000, eliminating the village assessor's added value for use increment. Upon appeal from that order by both the village and the taxpayer, the Tax Court found the fair market value of the land to be $1,420,000.

The essence of relator's argument is that the expert witnesses for respondent-taxpayer on the issue of market value of the land did not consider taxpayer's use of Black Dog Lake for cooling purposes as an increment to the value of the land so that their appraisals and the findings of the Tax Court failed, in the words of Minn. St. 273.12, "to consider and give due weight to every element and factor affecting the market value thereof." This intrinsic value, they contend, is a factor mandated by Schleiff v. County of Freeborn, 231 Minn. 389, 394, 43 N. W. 2d 265, 268 (1950).[2]

This claim must be examined in the context of what these appraisers affirmatively did consider in reaching their opinions as to value.[3]

---

[2] Relator's assessor had, as noted earlier in the text, placed a separate value in terms of an unproved cost of constructing a cooling tower for taxpayer's generating processes. Seemingly retreating from that untenable position, relator on oral argument in this court stated: "We don't claim that there should be any specific amount of money added to the value of this lake because it is used for a cooling tower. We only claim that the fact that it is used or usable for a cooling tower is one of the considerations that a real estate expert should take into consideration in determining the value of this land."

[3] The appraisers for the taxpayer were Ernest B. Moffet and E. Vincent Dolan, real estate appraisers of unquestioned qualification, and Frank D. Marzitelli, whose qualifications as an appraiser were challenged. Mr. Marzitelli is well known from his two decades of public service successively as a St. Paul city council member, assigned as commissioner of public works; deputy commissioner of the state department of highways; and executive vice-president of the Port Authority of St. Paul, in which positions he was responsible for acquisitions of land for public purposes and, more recently, for the acquisition of marginal lands for industrial development. Although he had no qualifying experience as an appraiser, it is clear from this record that the Tax Court neither accredited him as an appraiser nor accorded probative force to his dollar valuation of the land. His competence to testify as to the supply and demand for industrial use of river bottomlands in the metropolitan area cannot be questioned.

Weighing the location and character of the land, they concluded that it was not suited for industrial development and that the highest and best use was for park and recreation purposes, or like flood plain applications. The 16,000 acres of industrial land in the Twin City metropolitan area, according to the testimony, represent a 50-year supply, with a comparatively negligible demand for river bottomlands as industrial sites for reasons of economic feasibility of development and use. Based upon recent sales of lands they considered comparable bottomlands on navigable parts of the same river, ranging from $277 to $973 an acre, they variously estimated the per acre value of taxpayer's land at $225 (Marzitelli), $400 (Moffet), and $475 (Dolan).[4] The Tax Court, however, found the per acre value to be $1,000.

Valuation of taxpayer's land by these appraisers did not include a factor of use increment or intrinsic worth for the water cooling uses of Black Dog Lake.[5] The statutory test of "market value," Minn. St. 272.03, subd. 8, is the "usual selling price" at the place where the property is located. The usual selling price, as stated in In re Petition of Hamm v. State, 255 Minn. 64, 66, 95 N. W. 2d 649, 652 (1959), is "the price that could be obtained in a private sale between a willing seller and a willing buyer." A finding that, because of a restricted use, the land had a higher value that what otherwise would be the value of the highest use of property so situated was not compelled in the absence of evidence that the market value was in fact affected by such restricted use. This is so because, as stated in In re Delinquent Real Estate Taxes, Waseca County, 182 Minn. 543, 544, 235 N. W. 22 (1931), "[T]he sale value, not the actual value, is what must control." See, Crossroads

---

[4] Although relator contends that the appraisers' catalog of comparables omitted several recent sales of tracts similarly situated on the Minnesota River immediately to the west of Interstate Highway No. 35W, the appraisers were either unaware of the smaller such parcels or, in the case of larger tracts of which they were aware, were of the opinion that other factors of elevation and utility made them noncomparable. In either case, relator's contention is addressed to the consequent weight of their opinion evidence, the determination of which was for the Tax Court. The same observation may be made with respect to relator's argument that the highest and best use opinions of taxpayer's witnesses were "incredible."

[5] Witness Moffet was of the opinion that the use increment should be considered, if at all, as part of the value of the excluded improvements and not of the raw land.

Center Inc. v. Commr. of Taxation, 286 Minn. 440, 176 N. W. 2d 530 (1970).

The Tax Court itself, moreover, did not wholly ignore relator's claimed use increment value. It had before it not only the testimony of taxpayer's expert witnesses but, in addition, the testimony of expert witnesses for relator who did assign a higher value to the lake because of its use for cooling purposes, and it made a finding of value substantially more than stated in the opinions of taxpayer's expert witnesses. The court said:

"* * * If we were to add a 'use increment' to the value of this property then we would have to add a similar 'use increment' to all property in the State of Minnesota, which could be used for cooling purposes.[6] The fact that the lake has such capabilities is an item of value but the Village and its assessor have placed entirely too much emphasis on that factor. Therefore, even if the use as a cooling device represents the highest and most profitable use of Black Dog Lake, the market value of the Black Dog tract is affected only to the extent that demand for this use would increase the usual selling price of the land."

It thereafter concluded:

"* * * As we view the evidence of those sales that were comparable, and based on all other evidence of value, we find that the evidence will not support a finding of value in excess of $1000 per acre."

Our review of the independent findings of fact by the Tax Court is addressed to whether this specialized tribunal proceeded in conformity to law and whether the evidence reasonably supports its determination of value. Village of Aurora v. Commr. of Taxation, 217 Minn. 64, 14 N. W. 2d 292 (1944); Great Plains Supply Co. v. County of Goodhue, 268 Minn. 407, 129 N. W. 2d 335 (1964); Alstores Realty, Inc. v. State, 286 Minn. 343, 176 N. W. 2d 112 (1970). We accordingly affirm.

Taxpayer states that the millage rate applicable to the assessment for the year 1968 was not entered in the record and the Tax Court consequently did not compute the amount of refund due taxpayer on the basis of its decision. It therefore makes the unopposed request that the case be remanded to the Tax Court for completing that information as

---

[6] Witness Dolan testified to the obvious fact that actual or potential "Black Dog Lakes" exist in the bottomlands "all the way up and down the river."

provided in Minn. St. 271.12. The matter will be remanded to the Tax Court for appropriate proceedings relating to that matter.

Affirmed and remanded.

MR. JUSTICE TODD took no part in the consideration or decision of this case.