In the Matter of the Petitions of SPACE CENTER, INC. and Honeywell, Inc. for Reduction of ·Taxes and Assessed Valuation of a Certain Tract of Real Estate in the City of St. Louis Park, County of Hennepin.

SPACE CENTER, INC. and Honeywell Inc., Petitioners, Relators,

v.

COUNTY OF HENNEPIN, Respondent.

No. 50803.

Supreme Court of Minnesota.

Jan. 16, 1981.

Rehearing Denied March 9, 1981.

Lawrence M. Jolliffe, Kenneth M. Anderson, Minneapolis, for relators.

Thomas L. Johnson, County Atty. and Donald J. Lalor, Senior Atty., Civil Division, Minneapolis, for respondent.

SIMONETT, Justice.

This case is here on certiorari from the Tax Court. Space Center, Inc., and its tenant, Honeywell, Inc., filed petitions protesting real estate taxes assessed on January 2 in each of the years 1973 through 1977. The Tax Court found the assessments for 1973, 1974 and 1975 exceeded market value and ordered refunds but affirmed the assessments for 1976 and 1977.

Petitioners are here claiming the assessments for all 5 years are still too high and claiming, first of all, that the Tax Court erred in using "value-in-use" as the highest and best use of the property for calculating market value. We reverse on this issue. A second issue, relating to exempting government-owned property from taxation, becomes moot and so is not reached.

Space Center owns a building located on Cedar Lake Road in St. Louis Park near the Cooper Theatre. As originally constructed in 1966, it was a very large, one-story structure, situated on a 25.4-acre site, designed for use as a warehouse. It had a high 22-foot ceiling and 284,000 square feet of floor space (roughly 280 feet by 1,000 feet). Dozens of loading docks line its pre-cast concrete walls, which are substantially windowless, and the building is served by a railroad spur.

Honeywell began renting space in the building in 1966, rapidly expanding its occupancy so that it entirely occupied the building by 1968. In 1967 Honeywell had Space Center construct a second-floor, free-standing mezzanine with a 4-inch concrete deck, thereby adding 232,700 more square feet of floor space.

Honeywell uses the building for its defense contract business. Because of the volatility of this enterprise, the company leases on a short term basis with renewal options. The 1970 lease (under which the lessee pays the real estate taxes) was for 3 years with four 3-year options, giving Honeywell the opportunity to remain until 1985.

Inside the building, research, storage and office facilities are constructed to meet the requirements of each particular defense project. These facilities are permanent in the sense that standard building construction materials and methods are used, and the work requires normal building permits from the city. Walls are erected; heating, ventilation, air conditioning and lighting are installed; machines are moved in place. When, however, the contract for which these improvements were tailored has been completed, the facilities are torn up, rearranged and reallocated to other contracts. Many of the contracts last only 2 to 3 years. Crews are constantly at work tearing down and reconstructing areas within the building. For instance, in 1973 approximately 169,700 square feet of space was reconstructed, nearly one-third of the entire building. As of 1978, some 60% of the building was used for offices and laboratories and 40% for production.

To encourage firms to take defense work, the federal government provides much of the facilities, which may include real estate, buildings, machinery and equipment, and utilities. These are provided under "facilities contracts," each of which features a clause vesting title for the improvements in the government. Title to the property vests in the federal government whether it furnishes the facilities, pays for them, or reimburses a defense contractor after purchase. When a defense contract is completed, the contractor declares the government-owned facilities as "surplus." The government then decides whether to scrap the facilities, reallocate them to other contracts and contractors, sell them, or abandon them. Contractors must maintain records of precisely what floor space, machines and equipment are assigned to each contract; a brass tag or decal with an identifying number is attached to each piece of government equipment; and the contractor's records are regularly audited by the government.

In the building occupied by Honeywell, the government owns almost the entire power distribution system, 60% of the lighting, two of three elevators to the mezzanine floor, most of the building ventilation, and practically all equipment. Some of the power and ventilation equipment is highly specialized, such as blowers for forges, filters for "clean rooms," and desiccators for "dry" assembly rooms. Air conditioning and air treatment facilities were characterized as the "backbone" of certain production lines by Honeywell executives. The government-owned equipment also included general air conditioning, heating and lighting for offices. In total, government property represents an investment of about $2.25 million; Honeywell, in turn, has expended roughly $1.5 million.

Robert Locky, city assessor for St. Louis Park, the local taxing district, had assessed the Space Center property, on a mass appraisal basis, at $7,077,000 for 1973 and 1974 and $7,155,600 for the years 1975 through 1977. In 1974, in response to citizen interest, Locky did an individual appraisal,

which confirmed his original figures. On the other hand, Robert Boblett, Honeywell's expert, appraised the market value of the property at much lower figures:

| 1973 | $3,460,000 |
| 1974 | 3,700,000 |
| 1975 | 3,960,000 |
| 1976 | 4,240,000 |
| 1977 | 4,530,000 |

The difference in values between the two experts, both experienced and well-qualified men, rests in large part on the difference in their assumptions as to best and highest use of the property.

Locky took the best and highest use of the building to be its current use, i. e., the manufacture of military hardware with associated offices and laboratories. He appraised the building as it was configured on the assessment date, including all structures, machinery and equipment he judged to be fixtures, regardless of whether they were owned by Honeywell or the government. Thus, general lighting, air conditioning, heating, ventilating, power stations and elevators were included in his valuations, as well as the walls, ceilings, laboratories and the mezzanine floor itself. He did, however, exclude equipment which was obviously specialized, like the clean room air filters, dry room desiccators, and roof exhausts. Locky's apparent reasoning was to include all facilities needed for the building to function in its present configuration.

Boblett, on the other hand, denied the present use of the building is its best and highest. He maintained the building could not be sold on the market in its present configuration. Since no one but Honeywell could use the building in its present form and Honeywell has only a 3-year commitment, Boblett reasoned no businessperson would purchase the property unless the price reflected the cost of converting it to a usable layout.

There was other evidence to support Boblett's conclusion that the building is unmarketable in its present condition. Space Center owns two other warehouses, one in Roseville and the other in St. Paul. The Roseville building had also been leased to Honeywell and revamped for production, laboratory and office facilities, but when Honeywell quit the Roseville premises, stripping most of the building, Space Center found it was able to lease out only half of the areas not restored to warehousing. The St. Paul building had been leased to Univac, which built facilities similar to Honeywell's here, and when Univac moved out, Space Center was unable to lease it for over 6 months. Only after the interior was stripped, restoring the building to a warehouse, were tenants found.

To arrive at market value, Boblett visualized the property restored to a warehouse with associated office space, an "ideal configuration" which, in Boblett's opinion, was the highest and best use of the building. Using market data, income and cost approaches, he gave this ideal building a market value of $6,150,000. Boblett then subtracted a "cost to cure" of $1,300,000, that is the estimated cost of stripping the building and then restoring the stripped interior to its ideal shape as a warehouse. This net figure of $4,850,000 gave him his true market value for 1978, and from this figure he worked backwards, assuming the building had increased in value 7% each year.[1]

The Tax Court agreed with Locky, finding that "the present utilization of the subject property is the highest and best use of the property on the assessment dates under review." Since this was rental property, however, the Tax Court felt the actual rent generated should be given greater weight in the appraisal and so reduced the assessor's values for 1973, 1974 and 1975 to $6,500,000, $6,700,000 and $6,900,000, respectively.

---

1. Boblett had made an earlier appraisal of the property for Honeywell in 1973 and then concluded the market value was $6,000,000. Respondent and the Tax Court considered this significant. However, in making the earlier appraisal Boblett was not determining market value in the "willing seller and willing buyer" sense, *In re Petition of Hamm v. State*, 255 Minn. 64, 66, 95 N.W.2d 649, 652 (1959), but, as he stated in his written appraisal: "Fair market value as used in this report is considered to be the cost to the user of acquiring a similar facility for their present use."

Property is to be valued at its market value. Minn.Stat. § 273.11, subd. 1 (1980). Market value means the usual selling price—the price which would be obtained at private sale and not at forced or auction sale. Minn.Stat. § 272.03, subd. 8 (1980). In arriving at market value, an appraiser must consider many things:

> Location, cost of construction, cost of reproduction, purpose for which building was used, the intrinsic value or worth of the building, the price at which the owner is willing to sell, the price at which buyers who may use the property for some purpose are willing to buy, the price at which similar property, if any, has sold, and many other things are all proper elements of consideration for the purpose of determining the ultimate result, namely, the sale value.

*State v. Russell-Miller Milling Co., (In re Delinquent Real Estate Taxes, Waseca County)*, 182 Minn. 543, 544–45, 235 N.W. 22, 22 (1931). Intrinsic value, also called value-in-use, is the value of property to its present user. It is comparable to replacement cost to the present user. *See Village of Burnsville v. Commissioner of Taxation*, 295 Minn. 504, 202 N.W.2d 653 (1972); *Safran Printing Co. v. City of Detroit*, 88 Mich. App. 376, 276 N.W.2d 602 (1979).

■ The value-in-use of property is a proper consideration for an assessor. *Village of Burnsville*. But it still remains true that "[t]he sale value, not the actual value, is what must control." *State v. Russell-Miller Milling Co.*, 182 Minn. at 544, 235 N.W. at 22. The weight to be given value-in-use depends on there being buyers who would use the property in the same way. By arguing that its present use of the building is not the best and highest, Honeywell is claiming that too much weight was given to the value-in-use of the building by the assessor and the court below.

■ This court has dealt with value-in-use for tax valuation purposes twice before. In *Russell-Miller Milling Co.*, the assessor valued a grain mill, closed down for several years for lack of business and suffering deterioration. The owner had unsuccessfully tried to sell it for $50,000. Nevertheless, the assessor computed its value on a cubic foot basis, deducting for depreciation, and set a value of $169,900. This court observed the assessor's value may well have reflected the building's intrinsic worth, but clearly not its sale value, and reversed. *Id.* at 546, 235 N.W. at 23. In *Village of Burnsville*, taxpayer's generating plant was located in the Minnesota River bottomlands by a slough known as Black Dog Lake. The taxpayer used the slough for cooling water, eliminating the need for cooling towers. Because of this special use by the taxpayer, the assessor gave the land a higher value than nearby bottomland of a similar character, suited only for park and recreation purposes. There was no showing, however, that the slough's value to the present owner was reflected in the property's market value, and this court held the Tax Court correctly ruled that the assessor had placed "entirely too much emphasis" on the taxpayer's particular use of the slough. *Id.* 295 Minn. at 508, 202 N.W.2d at 657. In other words, one may consider the present use of the property only to the extent such present use reflects the property's value to buyers in the marketplace.

Helpful also is *Safran Printing Co. v. City of Detroit*, 88 Mich.App. 376, 276 N.W.2d 602 (1979). There a building was being used as a printing plant, even though evidence demonstrated the building was obsolete, inefficient, and unmarketable as a printing plant. Its current use probably would continue because the owner could not afford to relocate, but, if the building were sold, it would most likely be purchased as a warehouse. The trial court held the building's current use was the best and highest and valued the property accordingly. The Michigan Court of Appeals reversed, holding it was error to attribute a significant amount of value to the existing use of the property when that use bore no relationship to what a likely buyer would pay for the property. That the owner did not intend to sell was irrelevant, and the case was remanded to determine value on the basis of what the property "would most likely bring

if it were put on the market." *Id.* at 383, 276 N.W.2d at 605.

■ Here the evidence seems overwhelming that Space Center's building, if put on the market, would not be marketable in its present configuration. Its floors, walls, air conditioning, heating, lighting and power supply are tailored to the requirements of Honeywell's contracts. Even Honeywell cannot reuse the facilities and, instead, must demolish and reconstruct when one contract is completed and another is started. Boblett's opinion that a building of these dimensions has no market as configured is supported by Space Center's inability to market space in similarly configured buildings vacated by Honeywell and Univac until the buildings were restored to warehouses. While the city assessor, Locky, was unable to suggest any potential buyers for the property as it exists, he felt it was reasonable to assume the building would continue to be used in the future for its present purpose, and it was on this assumption the Tax Court found value-in-use to be the best and highest use. The test, however, is the value of the property in the market. In *Safran* the owner intended to keep using the building as a printing plant, and in *Village of Burnsville* NSP intended to continue using the slough as a cooling device. Since in both cases there was no showing such uses affected sales prices in the marketplace, undue weight had been given to value-in-use.

■ In these circumstances, the Tax Court's finding of present use as best and highest is clearly erroneous. That the building has the capability of being used in its present configuration is an item of value to be weighed only to the extent it affects the selling price of the building. We believe the present record establishes the best and highest use of the building to be the ideal configuration hypothesized by Boblett. Among the other factors here relevant to a calculation of value are the remaining term of the Honeywell lease and the cost of restoring the building after Honeywell strips and vacates it. We leave to the Tax Court the task of weighing these factors as they affect the selling price in the market to arrive at a final valuation for each of the 5 years in question.

Honeywell raises one final issue. Minnesota exempts from taxation "[i]nventories of raw materials, work in process and finished goods and machinery and equipment owned by the federal government and leased, loaned or otherwise made available and used by private individuals, associations or corporations in connection with the production of goods for sale to the federal government." Minn.Stat. § 272.01, subd. 3(d) (1980). Citing this statute, Honeywell contends the government-owned facilities in the Space Center building are tax exempt. The Tax Court disagreed, holding that the statutory exemption applied only to personal property and that the government-owned property had been incorporated into the building as fixtures.

We need not decide this issue. We have ruled that the highest and best use of the building is not its present use as a defense production facility, but as a restored warehouse with some office space. Under the "facilities contracts," any property presently owned by the government could remain after restoration only if conveyed to Honeywell or Space Center. Further, such facilities would no longer be property used "in connection with the production of goods for sale to the federal government" as required by the statute. The exemption issue is moot.

Reversed and remanded for further proceedings consistent with this opinion.