John W. WESTLING, et al., Petitioners, Respondents,

v.

COUNTY OF MILLE LACS, Relator.

No. C2–93–663.

Supreme Court of Minnesota.

March 4, 1994.

Mary K. Kopitzke, Mille Lacs County Atty. and Susan L.P. Hauge, Asst. County Atty., Milaca, for relator.

Ross L. Thorfinnson, Harvey, Thorfinnson & Lucas, P.A., Eden Prairie, for respondents.

## OPINION

PAGE, Justice.

This case comes to us on certiorari from the tax court. The Mille Lacs County Assessor appeals the decision of the Tax Court, Honorable Kathleen Doar presiding, that two environmentally-contaminated properties (the property) owned by John and Sharolyn Westling and leased by the Westling Manufacturing Company (the Company) had a nominal value of $100 on the assessment date in 1991. The Mille Lacs County Assessor had found the value of the two parcels to be $974,200. On review of the evidence, we find the tax court's judgment is not reasonably supported by the evidence as a whole. We also do not agree with the tax court's apparent conclusion that traditional appraisal methodologies cannot be adapted to the task of valuing contaminated property. We reverse and remand for reconsideration.

Since 1969 John Westling has worked for the Company and is currently its president. Sharolyn Westling is his wife. In 1987, the Westlings purchased a five-acre lot (P.I.D. 24–032–2501) from John's father. In 1988, John Westling constructed a building of 28,000 square feet on the property. This building, along with a pre-existing building, is used for company business. Twin City Federal provided a $400,000 mortgage loan to finance the new building.

In 1989, the Westlings purchased a contiguous 15.72–acre lot from John's father, of which 8.06 acres (P.I.D. 24–033–0410) is involved in this case. This lot included two buildings which the Company leases. Princeton State Bank provided a mortgage of $1,000,000 guaranteed by the Farm Home Administration. The FHA mortgage is guaranteed by a lease to the Company. The Westlings applied $400,000 of the loan to

retire the Twin City Federal mortgage on the first property. They paid $300,000 for the second property, and the remainder paid for equipment. The Westlings have personally guaranteed the loan with a life insurance policy. The loan is also cross-collateralized with a guarantee by the Company.

In connection with the purchase of the second parcel, a Phase I Environmental Survey revealed the property was contaminated with tetrachlorethylene. Tetrachloroethylene is a degreaser the Company uses in its business of remanufacturing auto parts. The Minnesota Pollution Control Agency (MPCA) believes the soil is also contaminated by heavy metals, but three years of testing has not verified that problem. The agency placed the property on the Comprehensive Environmental Response Compensation and Liability Information System (CERCLIS) and state Superfund lists in 1990. The MPCA named John Westling as a responsible party because he and his wife owned the property and because he knowingly allowed the Company to use hazardous substances.

At trial, Westling testified that from 1989 up to August of 1992, $250,000 had been spent, whether by him or the Company is unclear, to investigate and monitor the environmental problems at the site. He also testified that while he did investigate the pollution problem before closing on the second parcel, he did not entirely understand what being placed on the CERCLIS list meant. He did know, however, that there was a problem with soil contamination. Before closing on the second parcel, the FHA and Princeton State Bank required that $50,000 be escrowed for treating the pollution problem.

After purchasing the second parcel, John Westling contracted with Wenck ˜Associates (Wenck) for testing and engineering advice on the contamination. An employee of Wenck testified that, according to his rough estimates, the Company will spend approximately $60,000 per year for the next ten years on monitoring and cleaning up the site,

although the actual costs could be significantly different from this estimate.

At trial, the Westlings presented testimony indicating that a stigma attaches to polluted properties which makes them difficult to sell; that the real estate market in Minnesota is depressed; that unpolluted properties similar to the Westlings' were not selling rapidly; and that commercial properties located outside the Twin Cities area were inherently difficult to sell. One expert witness for the Westlings could not think of any contaminated property that had been sold in the last three years. Another expert testified that no party interested in purchasing the property could obtain financing because of the contamination and the associated stigma. This expert also testified that the loan the Westlings received from Princeton State Bank was more like a term operating loan than a real estate loan, and that he could not imagine anyone buying the Westling property given its contaminated state.

Licensed real estate appraiser, Charles Glassing, testified as the County's expert witness. In 1988 and 1989, Glassing had appraised the Westling property in connection with the mortgages they obtained. He did so again in 1992 at the request of the county. Using standard appraisal methodologies and incorporating information he obtained about the costs of cleaning up the property, as well as adjusting for the stigma associated with contaminated property, Glassing valued the property at $880,000.

Glassing used three different methods to appraise the property: cost, sales comparison, and income capitalization. He valued the property according to each method as though the property was uncontaminated, and then deducted the present value of the cost of cleanup. He further made an allowance for the effect of stigma on the property's value.[1] He appraised the property at $870,000 using the cost method; $910,000 using the sales comparison method; and $880,000 using the income capitalization method. In his opinion, the income capitalization method most accurately reflected the

---

1. Glassing commented that he regarded the amounts the Westlings had spent on monitoring the contaminants as a cost of doing business since the Company was the source of the contamination.

value of the property. Glassing's report was prepared in accordance with the Uniform Standards of Professional Practice in Title IX of the Financial Institutions' Reform, Recovery and Enforcement Act of 1989. He noted that the purpose of the appraisal was to estimate the market value of the fee simple interest of the property, subject to the underground contamination.

Throughout the years involved in this case, the Company leased the property for $94,000 annually. The County argued at trial that the prices the Westlings paid for the parcels in 1987 and 1989 indicate they have significant market value. The County's expert, however, stated that because the transactions were between relatives, he did not consider the purchases to be arms-length transactions, and, therefore, the purchase prices did not represent true market values.

The tax court found that because the property was placed on the Superfund list, and because both the extent of contamination and cost of curing it were unknown, the property was unmarketable. The court ordered the property appraised at a nominal value of $100.

■ Minn.Stat. § 273.11, subd. 1 (1992), provides that "all property shall be valued at its market value." "Market value," as defined in section 272.03, subdivision 8, is, "the usual selling price at the place where the property to which the term is applied shall be at the time of assessment." "A trial court's valuation of property for tax purposes must be sustained upon review unless it is clearly erroneous in the sense that it is not reasonably supported by the evidence as a whole." *In Re Assessments of Silver Lake Apartments v. County of Olmsted*, 295 Minn. 548, 549, 204 N.W.2d 415, 416 (1973) (citations omitted). Only "if the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed" should the tax court's finding be held to be clearly erroneous. 295 Minn. at 549–50, 204 N.W.2d at 416. In reaching its decision, the tax court must regard an assessor's valuation as prima facie valid, and require the taxpayer to shoulder the burden of proving that value excessive. *Schleiff v. County of Freeborn*, 231 Minn. 389, 395–96,

43 N.W.2d 265, 269 (1950); *Kalscheuer v. State*, 214 Minn. 441, 444, 8 N.W.2d 624, 626 (1943). If the court is persuaded by the taxpayer that traditional appraisal methodologies do not accurately value the property, the defects of those methods need to be made clear in its opinion.

■ We find that the tax court failed to hold the Westlings to their burden of proof because the court either ignored or failed to give sufficient consideration to too many undisputed facts. The tax court ignored the fact that one recent sale of contaminated property was the Westlings' own purchase of the second property, a purchase they made knowing the land was contaminated, and that the Westlings were able to obtain a loan for their purchase despite the contamination. The tax court's opinion reflects no consideration of the fact that the property, including the $400,000 building constructed by the Westlings and the three pre-existing buildings, is being used for a substantial commercial enterprise which generates $94,000 per year in income; that the Westlings have not actually attempted to sell the land; and that they are, at least in part, responsible for the contamination.

■ The tax court did not explain why the County's appraisal was wrong. We hold that traditional appraisal techniques, appropriately modified to account for the effects of environmental contamination, are adequate for determining a property's market value under Minn.Stat. § 273.11, subd. 1 (1992). Here, the County's appraiser used three traditional appraisal methods in arriving at his assessment. In each case he deducted the present value of the cost of cleanup as estimated by the taxpayer, and included a deduction for the claimed stigma attached to the property because of the pollution. The tax court rejected all three methods for no reason that appears in its memorandum. Therefore, we remand to the tax court for reconsideration in light of this opinion.

KEITH, C.J., and SIMONETT, J., concur specially.

KEITH, Chief Justice (concurring specially).

I concur that this matter should be remanded to the tax court. In concluding that this property, which still generates $94,000 per year of income for the taxpayers—income which admittedly is offset by the costs of cleaning up the contamination—had a nominal value, the tax court appears to have concluded that the phrase "market value," as used in Minn.Stat. § 273.11, subd. 1 (1992) means only the price which would be paid between an *actual* buyer and seller. This court has never held a county to such a standard under the statute.[1] I agree that, though "[property] may have no market value by reason of no demand, it should not escape its just share of the tax burden." *Minnesota v. Federal Reserve Bank of Minneapolis,* 25 F.Supp. 14, 18 (D.Minn.1938). This is particularly so where, as here, the taxpayers has some responsibility for the contamination which reduced or destroyed the demand for this property.

I agree that the traditional methods of appraising property—cost, sales comparison, and income capitalization—can be used to determine the value of contaminated property if appropriately modified to account for the contamination. The approach taken by the State of Oregon is instructive in determining how these methods may be modified.

*See* Or.Admin.R. 150–308.205(E) (1993). Oregon requires that an appraiser "shall consider" all three methods of appraisal, though some approaches may not be applied in certain cases.[2] *Id.* Oregon also requires that the income approach, which seems most applicable in this case, be modified in the following manner:

(A) The income stream may be adjusted to reflect the estimated annual cost of remedial work specific to the subject property to remove, contain, or treat the hazardous substance during those years the cost is incurred. The annual cost of remedial work may include the cost of environmental audits, surety bonds, insurance, monitoring cots [sic], and engineering and legal fees. The costs must be directly related to the clean up or containment of a hazardous substance.

(B) If the capitalization rate is derived from properties with similar contamination, no adjustment should be made to that rate. If the rate is developed from properties without contamination, or a built-up rate is used, consider adjustments for the increased present and contingent future risk of ownership, difficulties in future appreciation or depreciation, and the effect upon the ability to sell or transfer the property; that is, the liquidity of an investment in the property.

Respondents currently use the property. They are not being taxed because of a benefit they derive from the property which could not be derived by other potential purchasers.

---

1. *Village of Burnsville v. Commissioner of Taxation,* 295 Minn. 504, 202 N.W.2d 653 (1972), cited by Respondents, is not on point. In that case, we approved of the tax court's finding that property could not be valued higher than what otherwise would be the value of its highest use simply because it provided a benefit to a particular owner, absent a showing that that benefit affected the market value of the property. *Burnsville,* 202 N.W.2d at 656–57. The highest use of the property in question was for park and recreation purposes. *Id.* at 656. The taxpayer, however, used the property as a generating plant and benefitted from the property's close proximity to water because the company did not have to build a cooling tower. *Id.* at 655. Under those circumstances, we agreed that the taxpayer could not be taxed a greater amount because of a benefit it derived from the property which would not generally been derived by other potential purchasers.

In this case, by contrast, the Respondents' property has a highest and best use as a manufacturing or distribution center and this is how

2. The rules note that the sales approach should usually compare sales of similarly contaminated sites, but sales of property without contamination may be used with the following adjustments for cost to cure:

Adjustments shall be considered for the following:
(A) Limitations upon the use of the contaminated site due to the nature and extent of the contamination or due to governmental restrictions related to contamination;
(B) The increased cost to insure or finance the property;
(C) The potential liability for the cost to cure;
(D) Governmental limitations and restrictions placed upon the transferability of all or any portion of the contaminated sites;
(E) Other market influences.

(C) Alternatively, an income approach projecting the income stream as if the subject property was not contaminated, may be used when the cost to cure is deducted from the resultant value indicator.

*Id.*

The majority opinion cites the appraisal and valuation testimony of the County's expert, Mr. Glassing. But this testimony is only cited to show that the tax court's finding of nominal value is not sustainable on this record. The market value of the property for tax purposes remains to be determined by the tax court on remand, where there will be further proceedings in accordance with the guidelines this court has here set out.

SIMONETT, Justice (concurring specially).

I join in the special concurrence of Chief Justice Keith.