John W. WESTLING, et al., Relators,

v.

COUNTY OF MILLE LACS, Respondent.

No. C3-97-812.

Supreme Court of Minnesota.

July 9, 1998.

William L. Lucas, Edina, for Relator.

John H. Wenker, Assistant MilleLacs County Attorney, Milaca, for Respondent.

Hubert H. Humphrey III, Attorney General, State of Minnesota by Kelly S. Kemp, Assistant Attorney General, St. Paul, for Intervenor.

## OPINION

GARDEBRING, Justice.

In this case we consider the constitutionality of an unusual tax provision that functions to recapture property taxes lost when the assessed value of a parcel of property is reduced due to environmental contamination. Relators John and Sharolyn Westling challenged the "contamination tax," Minn.Stat. §§ 270.91–.98 (1996), arguing both that the imposition of the contamination tax violates the uniformity clause of the Minnesota Constitution and the equal protection clause of the Fourteenth Amendment to the United States Constitution and that it is a governmental taking without due process, in violation of the "takings" clauses in the Minnesota Constitution and the Fifth Amendment to the United States Constitution. The tax court upheld the constitutionality of the statute and we affirm, finding no constitutional infirmity in this unique form of taxation.

The Westlings own two contiguous parcels of property in Mille Lacs county, totaling 13.06 acres in size. The parcels were purchased from Mr. Westling's father in 1987 and 1989. The property, which is improved with an office warehouse structure of over 88,000 total square feet, is leased for $114,000 annual rent to Westling Manufacturing Company. The company remanufactures automotive parts. The site is contaminated by tetrachloroethene, a degreaser used in the remanufacturing process. The property is listed on the state "Superfund permanent list of priorities," which governs the order in which hazardous waste sites in the state are to be cleaned up.[1] John Westling has been

---

1. The Minnesota Environmental Response and Liability Act (Minn.Stat. ch. 115B.01–.24 (1996)), (hereafter "MERLA") was patterned after its federal counterpart, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601–75 (1997) (hereafter "CERCLA")). CERCLA and MERLA govern liability, cleanup and damages for pollution caused by a release or threatened release of a hazardous substance as defined by state and federal law. *See* 42 U.S.C. § 9601(14); Minn.Stat. § 115B.02.

·Subject to various defenses, MERLA imposes strict, joint and several liability on certain persons responsible for costs incurred to identify and remedy a release (or threatened release) of a hazardous substance, pollutant or contaminant from any facility. Minn.Stat. § 115B.04, subd. 1.

MERLA establishes procedures by which the Minnesota Pollution Control Agency ("MPCA") can take actions to protect the public health or welfare or the environment from a release or threatened release of hazardous substances or pollutants or contaminants. Minn.Stat. § 115B.17. MERLA permits the MPCA to bring actions against responsible persons to compel performance of response actions, or (under cer-

determined by the Minnesota Pollution Control Agency ("MPCA") to be a "responsible person" within the meaning of the state's hazardous waste clean-up law.[2] *See In re Westling Mfg., Inc.,* 442 N.W.2d 328 (Minn. App.1989). Westling Manufacturing Company has spent more than $1,085,626 to date to investigate, monitor and cure the contamination, pursuant to a "response plan" approved by the MPCA.[3] The future cost of cleanup is estimated at approximately $3,581,000.

The Westlings have been before this court on three prior occasions challenging the assessed value of the subject property, claiming that the presence of environmental contamination reduced its market value. *See Westling v. County of Mille Lacs,* 543 N.W.2d 91 (Minn.1996) ("*Westling III*"); *Westling v. County of Mille Lacs,* 531 N.W.2d 848 (Minn. 1995) (affirming tax court decision without published opinion) ("*Westling II*"); *Westling v. County of Mille Lacs,* 512 N.W.2d 863 (Minn.1994) ("*Westling I*"). In *Westling I,* we reversed the tax court's determination that the property had only a nominal value of $100 because it was "unmarketable," *Westling I,* 512 N.W.2d at 866. We remanded to the tax court for a valuation determination based on traditional appraisal techniques, holding that "[such] techniques, appropriately modified to account for the effects of environmental contamination, are adequate for determining a property's market value" for tax purposes. *Id.* In *Westling III,* we affirmed the decision of the tax court that the Mille Lacs county assessor's estimated market value of the property should be reduced to $0, based on the estimated cost of cleaning up the property and the stigma discount for the environmental damage. *Westling III,* 543 N.W.2d at 93.

In 1993, the Minnesota legislature enacted a new "contamination tax," effective beginning with 1994 taxes, payable in 1995. Act of May 24, 1993, ch. 375, art. 12, 1993 Minn. Laws 2728, 2941–49 *codified as amended* at Minn.Stat. §§ 270.91–.98 (1996). This act imposes an annual tax on the "contamination value" of taxable real property in Minnesota. Minn.Stat. § 270.91, subd. 1. "Contamination value" is "the amount of the market value reduction, if any, that is granted for general ad valorem property tax purposes for the assessment year because of the presence of contaminants." Minn.Stat. § 270.93. The tax applies if the reduction in value was granted by a court, a board of review, or by the county assessor, but is not imposed if the reduction in market value is less than $10,000. *Id.* In no case may the "contamination value" of a property be greater than the estimated cost of implementing a reasonable response plan. *Id.*

The tax is calculated by multiplying the "contamination value" by the property's class rate for *ad valorem* property tax, multiplied by another factor that varies according to certain characteristics of the property and the property owner. The variable factor depends upon whether the owner or operator of the property was legally responsible for the

---

tain conditions) to proceed with remedial action and recover the costs of remediation from one or more responsible parties. *Id.*

The MPCA has established a permanent list of priorities among releases or threatened releases of hazardous substances, for the purpose of taking remedial action. *See* Minn.Stat. § 115B.17, subd. 13. Properties are placed on the list based on criteria such as the relative risk or danger to public health, the potential for contamination of drinking water supplies, and the potential for direct human contact. *Id.*

**2.** A responsible person, for purposes of the present case, includes a person who owned or operated a facility when (a) the hazardous substance was placed in or on the facility; (b) when the hazardous substance was located in or on the facility but before the release; or (c) during the time of the release or threatened release. Minn. Stat. § 115B.03, subd. 1. A responsible person is strictly liable, jointly and severally, for response costs and damages resulting from a release or threatened release, or to which the release significantly contributes. Minn.Stat. § 115B.04, subd. 1.

Westling purchased the second parcel of land in 1989 knowing it was contaminated. Westling was named as a responsible party because he and his wife owned the property and as president of Westling Manufacturing, he knowingly permitted the company to use a hazardous substance. *See* Minn.Stat. § 115B.03, subds. 1, 3.

**3.** A "response plan" is a plan for cleanup or remediation of polluted property that has been approved by the MPCA or Department of Agriculture under Minn.Stat. § 469.174, subd. 17; Minn.Stat. ch. 18D; or Minn.Stat. ch. 115B. *See* Minn.Stat. § 270.92, subd. 6. Such a plan has been approved for the subject property.

contamination and whether the MPCA has approved a response plan for cleanup of the property under Minn.Stat. ch. 18D (1996) or 115B (1996), and work has begun on the response plan. The chart immediately following illustrates the four variable factors imposed under the act. *See* Minn.Stat. § 270.91.

| CLEANUP STATUS | OWNER OR OPERATOR A RESPONSIBLE PARTY | OWNER OR OPERATOR NOT A RESPONSIBLE PARTY |
|---|---|---|
| APPROVED RESPONSE PLAN UNDERTAKEN | 50% | 12.5% |
| NO RESPONSE PLAN OR NO CLEANUP DONE | 100% | 25% |

The contamination tax is payable at the same time and in the same manner as the regular *ad valorem* property tax, and is subject to the same penalty, interest, lien, and forfeiture provisions.[4] Minn.Stat. § 270.95. The tax is discontinued when the taxpayer provides the assessor with a written determination by the MPCA stating that all of the requirements of the response plan have been satisfied. Minn.Stat. § 270.94.

Because the Westlings are a "responsible party" with an "approved response plan," their property is taxed at 50% of the tax rate for the applicable property class, class 3a, industrial property. Minn.Stat. § 273.13, subd. 24 (1996). The Mille Lacs County assessor determined "contamination values" for the subject property of $1,003,400 as of January 2, 1994, and $1,600,000 as of January 2, 1995, and imposed contamination taxes on the property in the amount of $22,278.50 for 1994, payable in 1995, and $36,000 for 1995, payable in 1996.[5] The Westlings appealed the assessed tax to the tax court, contending that the tax violates the United States Constitution and the Minnesota Constitution. The tax court held that: (1) the contamination tax did not discriminate against certain properties in the same class, in violation of article X, § 1 of the Minnesota Constitution and the Fourteenth Amendment to the United States Constitution; (2) the contamination tax was not a governmental taking in violation of article I, § 13 of the Minnesota Constitution and the Fifth Amendment to the United States Constitution; and (3) the imposition of the contamination tax on the subject property was constitutional as applied. The same issues are now before us.

The constitutionality of a statute is a question of law, and this court owes no deference to a lower court's conclusions. *In re Blilie,* 494 N.W.2d 877, 881 (Minn.1993). Statutes are presumed to be constitutional, and the judicial power to declare a statute unconstitutional should be exercised "with extreme caution and only when absolutely necessary." *In re Haggerty,* 448 N.W.2d 363, 364 (Minn. 1989). The party challenging the constitutionality of the statute bears the burden of establishing "beyond a reasonable doubt" that the statute violates a constitutional right. *In re Conservatorship of Foster,* 547 N.W.2d 81, 85 (Minn.1996). The same defer-

4. If a response plan has not been implemented for the affected property, the county treasurer forwards 100% of the monies collected from the contamination tax to the local taxing district when the real property taxes are distributed. Minn.Stat. § 270.96, subd. 3(b). When work has begun on an approved response plan, the county may retain 5% of contamination tax revenues as compensation for administering the tax, and must forward the remaining 95% to the commis- sioner of revenue for deposit in the contaminated site cleanup and development account, revenues which assist the state in cleaning up environmentally contaminated sites. Minn.Stat. § 270.96, subd. 3(a).

5. The Westlings do not contest the assessor's factual determination of either the contamination value or the contamination tax for the subject property.

ence is applicable to a taxation statute as to other legislation. *Contos v. Herbst,* 278 N.W.2d 732, 736 (Minn.1979).

The Westlings argue, first, that imposition of the contamination tax violates the uniformity clause of the Minnesota Constitution and the equal protection clause of the Fourteenth Amendment to the United States Constitution. The "uniformity clause" of the Minnesota Constitution states that "[t]axes shall be uniform upon the same class of subjects and shall be levied and collected for public purposes * * *." Minn. Const. Art. X, § 1. It is established in Minnesota that the uniformity provision of the state constitution is no more restrictive upon the legislature's power to tax or classify than is the equal protection clause in the Fourteenth Amendment to the United States Constitution. *Kuiters v. County of Freeborn,* 430 N.W.2d 461, 463 (Minn.1988). The same test is used for both analyses. *Brainerd Area Civic Ctr. v. Commissioner of Revenue,* 499 N.W.2d 468, 472 (Minn.1993).

■ In order to prevail on a facial challenge to a statute on equal protection grounds, a taxpayer must prove, beyond a reasonable doubt, "that at least two classes are created by the statute, that the classes are treated differently under the statute, and that the difference in treatment cannot be justified." *In re McCannel,* 301 N.W.2d 910, 916 (Minn.1980). The Westlings argue that this principle is violated because the contamination tax statute results in properties within the same property class being taxed at "hundreds of different tax rates," through the application of the four variable factors. In essence, the Westlings assert that property within an *ad valorem* property tax classification cannot be further classified.

■ The test for the constitutionality of statutory classifications was enunciated by this court in *Miller Brewing Co. v. State,* 284 N.W.2d 353 (Minn.1979). The test consists of three prongs:

(1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is, there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Miller Brewing,* 284 N.W.2d at 356.

■ The first prong of the *Miller Brewing* test requires us to determine whether there is a legitimate basis for establishing a separate classification of taxable property. It is well-settled that the legislature has broad freedom to classify as to the subject-matter of taxation as long as there· is a reasonable ground for making a distinction and if the classification has a reasonable relation to the purpose of taxation. *Montgomery Ward & Co. v. Commissioner of Taxation,* 216 Minn. 307, 310, 12 N.W.2d 625, 627 (1943). However, a tax rate must operate without discrimination upon all property within a classification. *Apartment Operators' Ass'n v. City of Minneapolis,* 191 Minn. 365, 369, 254 N.W. 443, 445 (1934). Additionally, the classification must not be unreasonable, arbitrary or capricious. *Apartment Operators,* 191 Minn. at 366, 254 N.W. at 444. Legislative classifications not based on a suspect class nor affecting fundamental interests (as these have been defined by the United States Supreme Court) must be upheld under equal protection and uniformity clause analysis unless there is no reasonable basis for the classification. *McCannel,* 301 N.W.2d at 917. Inasmuch as there is no fundamental interest at issue here, we look first to whether the classification at issue here is "genuine and substantial," rather than "manifestly arbitrary or fanciful." [6]

---

6. Although the relators assert that the contamination tax infringes on a fundamental interest, namely, "the interest that taxpayers have under Minnesota and United States Constitutions in having their taxes based on actual value," that argument is without merit. In *Contos,* 278 N.W.2d at 740, this court held that the "wide-open tax amendment" of 1906 eliminated the requirement that all property be taxed on the basis of actual value. Contrary to relators' asser-

■ In the context of examining the reasonableness of a statutory classification, this court has stated that:

[t]he classification must be based on differences furnishing a reasonable ground for distinction between the several classes. In classifying property for the purpose of taxation, the Legislature is determining a matter of state policy and is not tied down to any narrow or technical rule.

*Apartment Operators*, 191 Minn. at 367, 254 N.W. at 444 (citation omitted). We think this case is akin to *Minnegasco, Inc. v. County of Carver*, 447 N.W.2d 878 (1989), which involved a claim by the utility that statutory inclusion of its personal property in property Class 3a and Class 4 violated the uniformity requirements of the U.S. and Minnesota Constitutions. Rejecting that argument, we said that the legislature's scheme was essentially a "class within a class," designed to recognize the "unique character" of the property at issue. *Id.* at 881. In the present case, the property at issue also has a "unique character," viz., its contaminated, hazardous state. Here the legislature has chosen three different criteria for including some property within the tax and excluding others. The first and primary distinction is that the tax applies only to property that has been reduced in assessed value due to the presence of environmental contamination. The second criterion is whether the taxpayer has been determined by the MPCA to be a responsible party. Third, a distinction is made based upon whether an approved response plan has been implemented for the property in question.

These are not arbitrary or fanciful distinctions, but are based on a recognition that contaminated property diminishes the *ad valorem* property tax base relied upon by local taxing authorities. In addition, the presence of contaminated property in a community may result in increased health risks, in decreased valuations for nearby properties, and in abandonment or underutilization of property, thereby contributing to community blight and economic distress. Contaminated property thereby poses a greater burden on

society than uncontaminated property. Further, the long term magnitude of that burden will vary, depending on whether there is a "responsible party" implementing an approved "response plan." Therefore, we conclude that the presence of environmental contamination, along with the extent of responsibility for clean up, are genuine and rational bases that the legislature may use to create the "class within a class" represented by the contamination tax.

■ The second prong of the *Miller Brewing* test considers whether the classification scheme is reasonably related to the purpose of the statute. The tax court, while acknowledging that the bill nowhere states the legislature's purpose, found that "it is reasonable to assume that the legislature intended to discourage environmental contamination, encourage the abatement of pollution and offset the costs of environmental regulation enforcement when it enacted the Contamination Tax."

Although the purpose of the enactment is not stated on its face, this court has previously declared that "[i]n equal protection analysis, [any] conceivable and legitimate reason for the legislative classification may provide the rational basis to satisfy the constitutional requirement of equality and uniformity for tax legislation." *Brainerd Area Civic Ctr.*, 499 N.W.2d at 472. In operation, the contamination tax recaptures revenue lost to counties that continue to provide services to affected properties, even though property taxes have been reduced due to the presence of contamination. It requires property owners who benefit from government services to pay for some of the costs of providing those services. The tax also acts as an incentive to property owners to clean up affected properties, since the implementation of an approved response plan for cleanup reduces by 50% the contamination tax otherwise imposed. *See* Minn.Stat. § 270.91. When work has begun on an approved response plan, the revenues generated by the contamination tax are deposited in the contaminated site cleanup and development account, thereby providing additional revenue to assist the state in

tions, we find no fundamental right in either the United States or Minnesota Constitution that the

legislative classification must be absolutely related to cash value.

cleaning up contaminated sites. Minn.Stat. §§ 270.96, subd. 3(a); 270.97. Additionally, the statute encourages responsible behavior by owners of uncontaminated property by substantially reducing the contamination tax obligation if the owner or operator is not responsible for the contamination.

It is reasonable to assume that the legislature enacted the contamination tax for the purposes of raising revenue, of strengthening the local tax base, of encouraging environmentally responsible behavior by owners and operators of property, and of encouraging cleanup of environmentally contaminated property. These are legitimate public purposes that the legislature may have intended to achieve by enactment of the contamination tax.

■ The second prong under equal protection and uniformity analysis also requires that the classification used by the legislature be rationally related to the legislature's objectives. Given the possible objectives we have listed above, and the deferential standard of our review, we conclude that the classifications identified in the statute are rationally related to the legislature's objectives in enacting the tax. Even if the classification scheme is imperfectly related to the legislature's objectives, imperfection is not a constitutional defect. It is only necessary that the classification be rationally related to the purpose. The wisdom and social effects of a statute lie within the secure domain of the legislature:

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

*McCannel*, 301 N.W.2d at 918–19 (quoting *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)). Furthermore, the legislature is not confined to a single remedy or means of accomplishing legitimate governmental purposes. Such social policy decisions are committed to the legislature, and we conclude that the classifications used by the legislature in enacting the contamination tax are rationally related to the purposes effected by the statute.

■ The third prong of the *Miller Brewing* test requires us to determine whether the purpose of the statute is one that the state can legitimately attempt to achieve. Under this prong, the legislature is afforded the widest possible latitude. This court has previously recognized that "*any* legitimate purpose can support [a] tax." *Erie Mining Co. v. Commissioner of Revenue*, 343 N.W.2d 261, 268 (Minn.1984) (emphasis in original). Since the constitution grants the legislature the power of classification, the only limitation on that power, according to the United States Supreme Court, is that the power "must not be exercised in 'clear and hostile discriminations between particular persons and classes.'" *Citizens' Tel. Co. v. Fuller*, 229 U.S. 322, 331, 33 S.Ct. 833, 57 L.Ed. 1206 (1913). Thus, unless it appears that the underlying purpose is invidious or arbitrary, the governmental purpose will be upheld. It is beyond question that the generation of revenue and the clean-up of environmental contamination are legitimate government purposes. Thus, we conclude, that the relators have not carried their burden of proving beyond a reasonable doubt that the "contamination tax," embodied in Minn.Stat. §§ 270.91–.98, violates either the uniformity clause of the Minnesota Constitution or the equal protection clause of the United States Constitution.

■ Relators' second argument, that the imposition of a contamination tax in excess of the value of their property constitutes a governmental taking without compensation, is also without merit. Relators argue that the subject property has no market value at all; therefore any tax at all imposed on the property is in excess of 100% of the property's value and therefore constitutes a confiscatory tax. The takings clause of the Fifth Amendment to the United States Constitution provides that no person "shall be * * * deprived of life, liberty, or property, without due pro-

cess of law." Article 1, § 13 of the Minnesota Constitution provides that "[p]rivate property shall not be taken * * * for public use without just compensation therefor, first paid or secured." The purpose underlying these provisions is to ensure that the government does not require "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Zeman v. City of Minneapolis*, 552 N.W.2d 548, 552 (Minn.1996) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). In this case, there has been no *per se* taking of the subject property; the Westlings do not allege that there has been an actual taking of title or permanent physical invasion of the subject property. Nor do the Westlings claim that they have been deprived of all economically beneficial or productive use of their property. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Thus the taking, if any, falls into the realm of economic regulation, by imposing a tax theoretically in excess of the property's value.

■■■ At the heart of the law concerning regulatory taking lies the notion that a constructive taking occurs when the state, in the exercise of its police power, goes "too far" in its regulation, so as to unfairly diminish the value of the individual's property, thus causing the individual to bear the burden rightly borne by the public. *Zeman*, 552 N.W.2d at 552. Generally, the determination of whether a taking has occurred is highly fact-specific, depending on the particular circumstances underlying each case. *Id.* (citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). In deciding whether a particular governmental action has effected a taking, the United States Supreme Court has also stated that a court must look both at the "character of the action" and at the "nature and extent of the interference with rights in the parcel as a whole." *Penn Central*, 438 U.S. at 130–31, 98 S.Ct. 2646.

The Supreme Court was faced with the argument that a tax was so confiscatory as to be unconstitutional in *City of Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974). In *Alco Parking*, the Pennsylvania Supreme Court had invalidated a Pittsburgh city ordinance that imposed a 20% tax on gross receipts from private operators of nonresidential parking places. *Id.* at 370, 94 S.Ct. 2291. In the opinion of the state supreme court, the tax was an uncompensated taking because it was "unreasonably high" and had caused nine of the 14 private parking lot operators to operate their parking facilities at a loss or only marginal profit. *Id.* at 372, 94 S.Ct. 2291. The United States Supreme Court reversed, stating that

> [t]he claim that a particular tax is so unreasonably high and unduly burdensome as to deny due process is both familiar and recurring, but the Court has consistently refused either to undertake the task of passing on the 'reasonableness' of a tax that otherwise is within the power of Congress or of state legislative authorities, or to hold that a tax is unconstitutional because it renders a business unprofitable.

*Id.* at 373, 94 S.Ct. 2291. Specifically, the Court went on to say that "[t]he premise that a tax is invalid if so excessive as to bring about the destruction of a particular business * * * ha[s] been 'uniformly rejected as furnishing no juridical ground for striking down a taxing act.'" *Id.* at 374, 94 S.Ct. 2291 (quoting *Magnano Co. v. Hamilton*, 292 U.S. 40, 47, 54 S.Ct. 599, 78 L.Ed. 1109 (1934)).

■■ In *Penn Central*, the Court identified several factors that are particularly significant to making the factual inquiry into whether a particular government act is a regulatory taking. *Penn Central*, 438 U.S. at 124–27, 98 S.Ct. 2646. In that context, the Court observed that the taxing power is an "obvious example" of a government action that, although having adverse economic consequences on individuals, is a power necessary to the existence of government. *Id.* at 124, 98 S.Ct. 2646. Thus, we conclude that neither the Fifth Amendment to the United States Constitution nor Article 1, § 13 of the Minnesota Constitution limits the power of the legislature to impose an otherwise valid tax.

We conclude, therefore, that the contamination tax, Minn.Stat. §§ 270.91–.98, does not

violate the United States Constitution or the Minnesota Constitution.

Affirmed.